**LONDON GUARANTEE & ACCIDENT CO.,
Limited, v. WOELFLE.**\*
No. 10386.

Circuit Court of Appeals, Eighth Circuit.
April 20, 1936.

\*Rehearing denied June 10, 1936.

James C. Jones, Jr., of St. Louis, Mo. (James C. Jones, Lon O. Hocker, Frank Y. Gladney, and Sullivan, Reeder & Finley, all of St. Louis, Mo., on the brief), for appellant.

J. L. London, of St. Louis, Mo. (John S. Leahy, Lambert E. Walther, and Leahy, Saunders & Walther, all of St. Louis, Mo., on the brief), for appellee.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

Mrs. Woelfle, the appellee, as plaintiff, brought this action at law upon two policies of accident insurance issued by the London Guarantee & Accident Company of London, England, to her husband, Dr. James E. Woelfle, of Cairo, Ill., who died September 9, 1932. The case was tried to a jury, which returned a verdict for the plaintiff. From the judgment entered thereon, the insurer has appealed. The parties will be referred to as in the court below.

Errors are assigned with respect to:

1. The jurisdiction of the court.

2. Rulings upon evidence.

3. The sufficiency of the evidence to support the verdict.

4. The argument of the plaintiff's counsel to the jury.

There are certain facts which are not in dispute. The policies in suit were in force at the time of the insured's death. Each provided insurance against "bodily injuries effected within the period of this policy through accidental means, directly and independently of all other causes." In case of total disability from accident, policy No. DN–6021 provided for a weekly indemnity, and provided also that if death resulted within 90 days after the accident, the principal sum of $15,000 and, in addition thereto, the weekly indemnity specified in the policy for the period between the date of the accident and the date of death, should be paid. Policy No. AL–27999 was for the principal sum of $22,500, which was payable in case the insured died as the result of an accident. It also provided for a weekly indemnity for total disability caused by accident. The $15,000 policy had also a provision for weekly indemnity for disability caused by disease; the $22,500 policy had no such provision. The plaintiff, at the time this action was commenced, was the owner of these policies, both of which, at the time of the death of the insured, were payable to his estate. At the time of his death, the insured was 60 years of age. He had lived in Cairo, Ill., for about 25 years, was actively engaged in the practice of his profession, and up to a few days prior to his death appeared to be in good health and spirits. On September 5, 1932, the insured played nine holes of golf with an old friend, Louis H. Block. After the game he was not in as good condition and spirits as before, and shortly thereafter gave evidence of being in pain. The following day he went to his office, but showed signs of suffering. On September 7th he was attended by Dr. Rendleman, a friend, who treated him for influenza and kept him in bed. Dr. Rendleman saw him again on September 8th. About 8:30 p. m. on September 9th, the insured died. Dr. Rendleman certified the cause of death as angina pectoris. An autopsy, performed some months after death, disclosed that the immediate cause of death was a rupture of the aorta. The insured's estate was probated in Illinois, and by order of the county court of Alexander county, Ill., the policies in suit were assigned to the plaintiff, who was the residuary legatee. Proofs of death were furnished to the defendant stating that the insured died as a result of a fall while playing golf on September 5, 1932. The defendant denied liability for the death. It did, however, make payment of the weekly indemnity for total disability of the insured for the three days prior to his death.

On June 23, 1933, the plaintiff moved to St. Louis, Mo., and took up her residence there. On August 7, 1933, she filed a petition against the defendant in the court below alleging ownership of the policies, and that the assured came to his death on September 9, 1932, as the direct result of an accidental fall, directly and independently of all other causes. On the same day a summons was issued, and it was served on August 9, 1933, upon the Superintendent of the Insurance Department of Missouri. The defendant on August 26, 1933, filed a motion to set aside the re-

turn of service by the marshal on the ground that the policies were issued in Illinois, that the insured resided in Illinois when the policies were issued and when he died, that they were payable to his estate which was administered in Illinois by an Illinois executor, that the plaintiff was not a bona fide resident of · Missouri, and that the superintendent had no authority to accept service of summons in Missouri.

An alias summons was issued and served on November 13, 1933, in St. Louis, Mo., by delivering a copy thereof and of the petition to Louis L. Roth, a licensed agent of the defendant. On November 28, 1933, the defendant moved to set aside the return of service of the alias, summons on the ground that the defendant was a corporation organized under the laws of Great Britain duly licensed to transact the business of insurance in the state of Missouri, and had, pursuant to section 5894 of Missouri Rev.St.1929 (Mo.St.Ann. § 5894, p. 4495), appointed the Superintendent of the Insurance Department of Missouri its agent for the acceptance of process on its behalf; that the method prescribed by the statutes of Missouri for service of process in actions instituted against foreign insurance companies was exclusive; and that the superintendent was therefore the sole, exclusive, and only agent of the defendant in Missouri upon whom service could lawfully be made.

The court below overruled both motions to set aside the returns of service. Thereupon the defendant filed its answer, wherein it denied every allegation of the plaintiff's petition.

Upon the trial the issues of fact were: (1) Did the insured on September 5, 1932, sustain a fall? (2) If he did, was the fall, directly and independently of all other causes, the cause of his death on September 9th? The court below was of the opinion that, under the evidence, these issues of fact were for the jury, and denied the defendant's motion for a directed verdict.

### The Jurisdiction of the Court.

In asserting that the service of the original summons was ineffectual to confer jurisdiction, defendant relies on State ex rel. American Cent.• Life Ins. Co. v. Landwehr, 318 Mo. 181, 300 S.W. 294. There the policy was written in Kansas by an Indiana company licensed in Missouri, the insured was at all times a resident of Kansas, and the plaintiff at the time the suit was instituted was a resident and citizen of Kansas. The suit was therefore brought by a resident of Kansas upon a Kansas contract which had matured while the insured was residing in Kansas. The Supreme Court of Missouri held that the laws of Missouri did not authorize the Superintendent of the Insurance Department of Missouri to accept service of process under the circumstances. It said, however, in referring to the statutory provision that service upon the superintendent should "be deemed personal service upon such company, so long as it shall have any policies or liabilities outstanding in this state": "Policies outstanding in this state necessarily include policies written outside of this state which are owned and held by residents of this state at the time suit is instituted thereon." Page 297 of 300 S.W. The court also said that, since "the contract of insurance sued on by Mrs. Row [the beneficiary] was not made in Missouri and is not outstanding in Missouri, service of process in her suit upon such contract of insurance, made upon the superintendent of the insurance department, cannot be sustained." Page 298 of 300 S.W.

Apparently the reason the policy of Mrs. Row was not "outstanding in Missouri" was that it was not a policy owned and held by a resident of Missouri at the time suit was instituted.

In our case the suit was brought by a resident of Missouri upon Illinois policies. At the time the suit was instituted the plaintiff owned and held these policies. Therefore, under the quoted language of the opinion in the Landwehr Case, these were policies outstanding in Missouri, and service of summons on the superintendent was valid service. Even though the portion of that opinion upon which this conclusion is based be considered obiter, the conclusion still has ample support in the decisions of the Missouri Supreme Court because the opinions in Gold Issue Mining & Milling Company v. Pennsylvania Fire Ins. Co., 267 Mo. 524, 184 S.W. 999, and State ex rel. Pacific Mutual Life Ins. Co. v. Grimm, 239 Mo. 135, 143 S.W. 483, which sustain the validity of such service as was made in this case, notwithstanding the plaintiff in each of those cases was a nonresident when suit was brought, were overruled by the Supreme Court of Missouri in the Landwehr Case only in so far as they affected the exact question pre-

sented in that case. Saunders et al. v. London Assur. Corporation (C.C.A.8) 76 F.(2d) 926. Until the Supreme Court of Missouri has held that in a suit brought by a Missouri resident against a foreign insurance company licensed in Missouri upon a policy which was issued and which matured in another state, service of process may not be accepted by the Superintendent of Insurance of Missouri, this court should not be asked to invalidate such service.

Whether the court below acquired jurisdiction also by virtue of the service of the alias summons upon its agent, because the defendant was an alien corporation which was suable in any federal district in which it might be found regardless of state statutes, it is not necessary for us to determine; but see In re Hohorst, 150 U.S. 653, 662, 14 S.Ct. 221, 37 L.Ed. 1211; Galveston, H. & S. A. R. Co. v. Gonzales, 151 U.S. 496, 503, 14 S.Ct. 401, 38 L.Ed. 248; In re Keasby & Mattison Co., 160 U.S. 221, 229, 16 S.Ct. 273, 40 L.Ed. 402; Barrow Steamship Company v. Kane, 170 U.S. 100, 112, 18 S.Ct. 526, 42 L.Ed. 964; Morris & Co. et al. v. Skandinavia Ins. Co., 279 U.S. 405, 49 S.Ct. 360, 73 L.Ed. 762; United States Merchants' & Shippers' Ins. Co. v. Elder Dempster & Co., Ltd., et al. (C.C.A.2) 62 F.(2d) 59; Fisher v. Canadian Pac. Ry. Co. (D.C.N.Y.) 1 F.Supp. 235; Maxfield v. Canadian Pac. Ry. Co. (C.C.A.8) 70 F.(2d) 982; Sandusky Foundry & Machine Co. v. De Lavaud et al. (D.C.) 251 F. 631, 632; Vestal v. Ducktown Sulphur, Copper & Iron Co. (D.C.) 210 F. 375.

### Rulings upon Evidence.

Louis H. Block was the insured's companion during the golf game on September 5, 1932. So far as the record shows, Mr. Block knew more about what occurred during the golf game than any one except the insured himself. Block's deposition was taken by the plaintiff on May 5, 1933, and read into evidence on the trial. He was asked what happened while they were playing the nine holes. He answered that nothing unusual happened "except where we lost our ball"; that he did not know of anything unusual happening; that he did not notice anything. He was asked whether he saw the insured fall, and said that he did not. He was then asked whether he saw him getting up off the ground, and he answered: "I glanced over in his direction on one occasion and I saw him straightening himself up." Then followed this question and answer: "Q. Now, what do you mean by straightening himself up? A. Well, he was in—as I glanced up, I just saw him straighten up as though he was getting up from the ground; he might have been—he might have found his ball at that time; that is the only time I noticed that he was getting up from the ground." Block testified that the incident referred to occurred on No. 7 fairway, and that after the seventh hole the insured's game was not as good as before; that he never saw the insured alive after they left the golf grounds. He was then asked when he had changed his mind about the insured having fallen. The question was objected to on the ground that it was an attempt by the plaintiff to impeach and to cross-examine her own witness. The objection was overruled. His answer was, "What do you mean by that?" He was asked the following questions and gave the following answers: "Q. Didn't you state before that the doctor had fallen?" This was objected to on the same ground, and the objection overruled. "A. Well as the matter was presented to me—Q. To refresh your recollection, let me show you this paper marked Exhibit 2, and ask you if that is your signature on there." This was again objected to as cross-examination and an attempt by the plaintiff to impeach her own witness. The objection was overruled, and the answer was: "Yes, sir." The exhibit was an affidavit reading as follows: "To Whom It May Concern.

"This is to certify that on the afternoon of Monday, September 5th, 1932, while playing golf with Dr. James E. Woelfle on the course of The Egyptian Golf Club near Mounds, Illinois, I, Louis H. Block, saw him fall while in the act of looking for his golf ball on number seven fairway.

"[Signed] Louis H. Block.

"Subscribed and sworn to before me, a Notary Public, this 21st day of December, 1932.

"[Signed] Helen O'Connell, Notary Public. [Seal]"

Block testified that this affidavit refreshed his recollection about the accident. He was told to explain. He testified that he furnished the affidavit to Mrs. Woelfle at her request to enable her to collect the insurance, and that he wrote it himself and had it notarized. He was interrogated

with respect to his relations with Mr. Kleb, the agent of the defendant at Cairo, who was absent at the time Block made the affidavit. Block testified that he was a close friend of Mr. Kleb and discussed the accident with him upon Kleb's return to Cairo. He testified that he did not see the insured on the ground. He was shown a written statement signed by him (Block) on January 19, 1933, in which the following language appears: "When we were on No. 7 fairway, I saw Doctor Woelfle picking himself up from the ground after a fall. I was about 100 or 150 ft. away. I did not think it was serious. * * * When I saw him getting up from the ground he was on his side, but I do not recall which side. I knew he had fallen but I did not consider it serious. The remaining holes after he fell he played poorer than usual. His score was higher than usual." Being questioned about this statement, Block at first said it was correct as near as he could remember, but then testified that he did not know that the insured fell, that he did not say "what was in that statement," that he did not remember saying "after falling," and that he read the statement over, but not very carefully, and signed it.

He was then asked about another written statement which he had signed on January 30, 1933, in which the following appears:

"After driving off No. 7 tee, both of our balls were lost in the grass. Dr. Woelfle's ball fell about 150 feet to 200 feet west of where mine fell. He and his caddy went to look for his ball and my caddy and I walked over to look for my ball. While making the search for my ball, I glanced over in his direction and saw Dr. Woelfle getting up from a sitting position on the ground as though he had fallen. When I saw him on his feet, I paid no more attention to him but kept on looking for my ball. About two or three minutes later he came over to help me look for my ball. He said nothing about having fallen nor made any complaints. * * *

"I noticed that the Doctor's play was not so good thereafter and that his score for the seventh, eighth and ninth holes were above his average."

Being questioned about this statement, Block said it was true and that he did see the doctor get up from the ground as though he had fallen, but that he could not say that he had fallen. He was then asked the following questions, and gave the following answers:

"Q. Now do you recall that you said when you saw him getting up from the ground he was on his side, but you didn't recall which side? A. Yes, sir.

"Q. That was true, wasn't it? A. Yes, sir.

"Q. And you also said you knew he had fallen, but you didn't consider it serious? A. That is what the statement says.

"Q. That was true, wasn't it? A. Yes.

"Q. And it is true, now, isn't it? A. I don't know.

"Q. What would have happened since then to change your view about it? A. Well, I couldn't swear that he had fallen."

On being cross-examined by the defendant, Block testified that when he gave his affidavit to Mrs. Woelfle she had told him that some of her insurance was being held up for an affidavit of a witness to the accident and had asked him if he saw the doctor fall, and he told her he had not; that she wanted to know if he would make the "statement so as to support the doctor's statements to the policy so that the insurance company would pay the balance"; that Mrs. Woelfle stated to him that the doctor had told her that he fell; and that he (Block) then made the affidavit not knowing that she was having trouble with her insurance; that he told her that as a friend of the family he would make the affidavit and because she said the doctor had told her that he had fallen; that he did not see the doctor fall but saw him straighten up, but did not know whether he had been picking up a ball or tying his shoe or had stooped over for any other purpose. He testified that his affidavit that he saw the insured fall was false and was made to help Mrs. Woelfle; that the second written statement was prepared by plaintiff's counsel; that the language, "I saw Dr. Woelfle pick himself up from the ground after a fall," was false; that he signed the statement because he read it as "after he had fallen" and did not read it carefully because he was in a hurry; and that the statement was prepared in Mrs. Woelfle's home. He testified that the language of the statement: "When I saw him getting up from the ground he was on his side but I don't recall which side. I know he had fallen

but I did not consider it serious," was false and was made partly through his misunderstanding and reading the paper over too hurriedly and partly to help Mrs. Woelfle as a friend of the family. He testified that prior to signing this statement he had told both Mrs. Woelfle and her counsel that he had not seen the doctor fall. He then testified that his statement that he saw "Doctor Woelfle getting up from a sitting position on the ground as though he had fallen" was true; that he saw him get up; that it simply appeared to him as though he might have fallen; that it appeared as though he had been down on the ground and was getting up, but he could not tell whether he had fallen or had found his ball and was stooping over to pick it up, or was tying his shoe or picking up stones, flowers, or grass.

On redirect examination, Block testified that he was present when his second signed statement was prepared; that plaintiff's counsel asked him questions and wrote as he (Block) told him; that he signed the statement, but it turns out it was not true; that counsel for plaintiff asked him to send a statement of additional facts in his own words and he prepared it and sent it by mail; and that this was his last written statement and was true.

█ The defendant contends that the cross-examination of Block by plaintiff with respect to the statements which were in conflict with his testimony was improper and constituted impeachment of the plaintiff's own witness contrary to the rules of evidence.

There has been since time immemorial a general rule that one may not impeach his own witness by showing that he has previously made statements contradictory of or inconsistent with his present testimony, a rule which has, in the interests of justice, come to be more honored in its breach than in its observance. The history of the rule and the reasons for it will be found fully set forth and discussed in Wigmore on Evidence (2d Ed.) § 896 et seq. Viewing a trial as a sporting event in which only the parties have any interest, the rule might be adhered to, like one of the rules of any game. The purpose of a trial, however, is to seek for and, if possible, find the truth and to do justice between the parties according to the actual facts and the law, 'and any rule which stands in the way of ascertaining the truth and thus hampers the administration of justice must give way. The parties to a lawsuit, if they are honest, do not manufacture witnesses or evidence. The witnesses are determined by circumstances over which the parties usually have no control. Block was not the plaintiff's witness or the defendant's witness in the sense that either arranged for his presence at the golf links on September 5, 1932. He happened to be with the insured at the time the plaintiff claims the insured fell. Block knew more than any one else as to what, if anything, happened to the insured that afternoon.

█ The burden of proving the allegations of her petition was on the plaintiff. Block turned out to be a reluctant and an evasive witness. He had given statements absolutely inconsistent with the testimony which he at first gave when his deposition was taken. If the plaintiff was precluded from cross-examining him as to what he saw and as to what he had previously stated he had seen, she was helpless in developing evidence of circumstances observed by him which would or might justify the inference that the insured sustained a fall. It may well be doubted whether the plaintiff could properly claim that she was actually surprised by Block's testimony. At the time she took his deposition she had his last statement, which he later testified was true. She perhaps had no right to suppose his deposition would be more favorable to her than that statement. She did, however, have reasonable grounds to believe that Block knew that the insured sustained a fall.

In Hickory v. United States, 151 U.S. 303, at page 309, 14 S.Ct. 334, 336, 38 L. Ed. 170, the Supreme Court said: "When a party is taken by surprise by the evidence of his witness, the latter may be interrogated as to inconsistent statements previously made by him for the purpose of refreshing his recollection and inducing him to correct his testimony; and the party so surprised may also show the facts to be otherwise than as stated, although this incidentally tends to discredit the witness."

In St. Clair v. United States, 154 U.S. 134, 150, 14 S.Ct. 1002, 1008, 38 L.Ed. 936, the court said: "An exception was taken to the mode in which the district attorney was permitted to examine one of the witnesses introduced by the government. The attorney announced that the answers of the witness had taken him by surprise, and

asked that he be permitted to put leading questions to him. This was allowed, and we cannot say that the court, in so ruling, committed error. In such matters, much must be left to the sound discretion of the trial judge, who sees the witness, and can therefore determine, in the interest of truth and justice, whether the circumstances justify leading questions to be propounded to a witness by the party producing him. In Bastin v. Carew, Ryan & M. 127, Lord Chief Justice Abbott well said that 'in each particular case there must be some discretion in the presiding judge as to the mode in which the examination shall be conducted in order best to answer the purposes of justice.' The rule is correctly indicated by Greenleaf when he says: 'But the weight of authority seems in favor of admitting the party to show that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial, or to what the party had reason to believe he would testify, or that the witness has recently been brought under the influence of the other party, and has deceived the party calling him. For it is said that this course is necessary for his protection against the contrivance of an artful witness, and that the danger of its being regarded by the jury as substantive evidence is no greater in such cases than it is where the contradictory allegations are proved by the adverse party.' 1 Greenl.Ev. (12th Ed.) §§ 444, 435; Tayl. Ev. (6th Ed.) § 1262a; Regina v. Chapman, 8 Car.& P. 558, 559; Regina v. Ball, 8 Car.& P. 745; Clarke v. Saffery, Ryan & M. 126."

In Curtis v. United States (C.C.A.10) 67 F.(2d) 943, the Tenth Circuit had before it a situation in many respects similar to that which we are discussing. In that case, counsel for the government called a witness, Toole. During his examination they asserted that they were surprised by his testimony, and asked leave to cross-examine him. He was asked as to a prior inconsistent statement. Objection was made. The trial court said: "We are seeking the truth here, any way we can bring that out. If he makes two contradictory statements let the jury hear them both and then it is for them to say which is the correct one. It is not any more binding upon him than the statement he makes here." In passing on the propriety of the ruling, the Circuit Court of Appeals said [page 946 of 67 F.(2d)]:

"Toole proved to be an adverse witness. It was then within the discretion of the court to permit his cross-examination by counsel for the Government. St. Clair v. United States, 154 U.S. 134, 150, 14 S.Ct. 1002, 38 L.Ed. 936.

"It was not error to elicit, on such cross-examination, that Toole had made prior conflicting statements. This point was fully considered by the Second Circuit in Di Carlo v. United States (C.C.A.) 6 F.(2d) 364, 367, where the court said:

"'The point just considered leads to the next, which concerns the examination of the witness Gilmore herself. She told the same story as Pattitucci up to the point of the attack, when as we have said she declared that she could not identify the defendants. The prosecution, plainly surprised by this volte face, then began to cross-examine her straitly, and brought out from her contradictory statements, made not only before the grand jury, but on other occasions. Her actual evidence before the grand jury was not introduced. The latitude to be allowed in the examination of a witness, who has been called and proves recalcitrant, is wholly within the discretion of the trial judge. Nothing is more unfair than to confine a party under such circumstances to neutral questions. Not only may the questions extend to cross-examination, but, if necessary to bring out the truth, it is entirely proper to inquire of such a witness whether he has not made contradictory statements at other times. He is present before the jury, and they may gather the truth from his whole conduct and bearing, even if it be in respect of contradictory answers he may have made at other times.

"'In St. Clair v. United States, 154 U.S. 134, 14 S.Ct. 1002, 38 L.Ed. 936, this procedure was approved, as also in Swift & Co. v. Short, 92 F. 567, 34 C.C.A. 545 (C.C.A.8); Hays v. Tacoma R. & P. Co. (C.C.) 106 F. 48; Tacoma R. & P. Co. v. Hays, 110 F. 496, 497, 49 C.C.A. 115 (C.C.A.9). See, also, Hickory v. United States, 151 U.S. 303, 309, 14 S.Ct. 334, 38 L.Ed. 170. The question decided in Putnam v. United States, 162 U.S. 687, 16 S.Ct. 923, 40 L.Ed. 1118, did not arise here. Nor was the right abused as in Rosenthal v. United States, 248 F. 684, 160 C.C.A. 584 (C.C.A.8). The possibility that the

**334**

jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he·said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath·in court.'

"The statement of the court, ·quoted above, made at the time this evidence was being elicited, was not prejudicial and was a correct statement of the law. The observation that 'we are seeking the truth here,' was a ·mere statement of what· is the primary purpose in every trial of an issue of fact to a jury."

See, also, Craig v. United States (C.C. A.9) 81 F.(2d) 816, in which Di Carlo v. United States (C.C.A.2) 6 F.(2d) 364, 368, is also cited with approval.

In Levy v. United States (C.C.A.8) 35 F.(2d) 483, at page 484, Judge Kenyon used the following language in delivering the opinion of the court: "During the examination of the government's witness Ervin, the court permitted government counsel to ask of said witness leading questions. This witness was apparently contradicting statements he had made at other times—some under oath. The district attorney ·stated he was taken by surprise, and the court permitted him to ask leading questions as to whether or not Ervin had testified at other times contrary to what he was then testifying. The court is not a mere automaton simply to register rulings on objections to evidence, helpless to thwart perjury, and compelled to witness its triumph. It is within the court's sound discretion to determine whether the circumstances are such as to justify leading questions to the government's witnesses. The court sees the witnesses, as we do not. It is concerned with the development of a truthful narration of occurrences in the interest of ·justice—not merely to the defendant, but to the government as well."

See, also, Randazzo et al. v. United States (C.C.A.8) 300 F. 794; Smith v. United States, 57 App.D.C. 71, 17 F.(2d) 223; Swift & Co. v. Short (C.C.A.8) 92 F. 567; Hays v. Tacoma Ry. & Power Co. (C.C.Wash.) 106 F. 48; Tacoma Ry. & Power Co. v. Hays (C.C.A.9) 110 F. 496; Beavers et al. v. United States (C.

C.A.6) 3 F.(2d) 860, 863; Sneed et al. v. United States (C.C.A.5) 298 F. 911; Selover v. Bryant, 54 Minn. 434, 56 N.W. 58, 21 L.R.A. 418, 40 Am.St.Rep. 349; Abdo et al. v. Townshend et al. (C.C.A.4) 282 F. 476.

■ A trial court, for the purpose of expediting the trial of a case, eliciting the truth, and furthering justice, has a wide discretion with respect to the examination of witnesses, and may permit the cross-examination, within reasonable limits, by the party calling him, of a material witness who is apparently hostile, adverse, reluctant, evasive, obtuse, timid, or deceitful, and it is not an abuse of the court's discretion to permit such a witness to be interrogated as to previous inconsistent or contradictory statements. Where the trial court has permitted a party thus to cross-examine his own witness, there should be no reversal on that account unless it can be made to appear that justice was obstructed, and not furthered, thereby and that substantial prejudice resulted. Cross-examination should not be permitted to enable the party to put words into the mouth of a friendly witness, to intimidate, coerce, browbeat, or punish an honest witness, or to enable an artful witness to get before a jury untruthful statements not otherwise admissible. These things a trial court can ordinarily guard against. The rule as we have announced it is, we think, that which has come to be generally applied in the trial of lawsuits. The claim of surprise has become largely a gesture which adds little or nothing to the trial court's discretion.

■ The court below did not err in refusing to sustain the defendant's objection to the cross-examination of Block by the plaintiff.

It is asserted that the court erroneously permitted the plaintiff to introduce evidence of statements made by the insured to others that he had had a fall on September 5, 1932. The defendant in its brief says .that the court "permitted Mrs. C. W. Berbling, Dr. J. J. Rendleman and the plaintiff herself to testify that the insured had told them on September 6 and 7, 1932, that he had sustained a fall during the golf game of September 5, 1932."

The record shows that Mrs. Berbling gave no ·testimony that the insured ever told her .that he had a fall. Her testimony .tended to prove merely that he ap-

peared to be suffering pain on September 6th when she went to call on him at his office.

Dr. Rendleman was called as a witness for the defendant, and on direct-examination testified that he attended the insured on the morning of September 7th at the request of Mrs. Woelfle, and examined and prescribed for him; that the insured had an attack of influenza; that he (the doctor) saw the insured again on September 8th, and that the insured said to him he thought he was improving; that the doctor called again that afternoon, and that the insured said that he felt better; that the doctor was again called at 8:30 p. m. on September 9th by Mrs. Woelfle and reached the insured just as he expired; that, in the opinion of the doctor, the cause of the insured's death was angina pectoris. On cross-examination, the doctor testified that when he first saw the insured, he asked him how he felt; that the insured told him that he ached all over, and the doctor then examined him and diagnosed his illness as influenza. The doctor was then asked this question: "Did he tell you about an accident he had had?" This was objected to as calling for hearsay testimony. The objection was overruled. The answer was: "He complained of some pain in his back and I asked him if he had had any accident." Then followed this question: "What did he say, Doctor?" The doctor's answer was: "He said he didn't know for sure; he said he may have slipped or fallen when playing golf on Labor Day." On being asked whether the insured said anything about when the pain in his back started, the doctor testified: "No, he didn't talk much about it, didn't seem to regard it as of very much importance; that is the way I understood it." On rebuttal, the plaintiff offered in evidence a "Certificate of attending physician for personal, accident and health claims," made and signed by Dr. Rendleman and sent by him to the defendant in connection with the insured's claim for total disability prior to death. The certificate contained this statement: "He [the insured] claims to have fallen on golf course." This evidence was objected to as incompetent, irrelevant, and not rebuttal. The court received it.

On rebuttal, also, the plaintiff was asked the following questions, and gave the following answers:

"Q. Now, Mrs. Woelfle, there was testimony here in which Doctor Rendleman made the statement that the Doctor was not sure about falling. Were you present at that conversation? A. I was.

"Q. Will you tell us what it was?" (This was objected to as not proper rebuttal and incompetent. The objection was overruled.)

"Q. You may tell us what he did say about that. Just confine your statement to what he said about that. A. What Doctor Woelfle said?

"Q. Yes, to Doctor Rendleman. A. Doctor Woelfle told Doctor Rendleman that on Labor Day, in the afternoon, while he was playing golf on the seventh fairway, he lost his golf ball, and while hunting for it, he stepped in a hole and fell, and he said, 'Doctor, it just jarred me terribly'. . He said, 'I tried to save myself and couldn't.' "

The statements of a patient to his attending physician as to the patient's then physical condition, including his present ills, pains, and symptoms, when made for the purposes of diagnosis and treatment, are admissible in evidence under an exception to the rule against hearsay. Northern Pacific Railroad Co. v. Urlin, 158 U. S. 271, 275, 15 S.Ct. 840, 39 L.Ed. 977; Cleveland Ry. Co. v. Merk, 124 Ohio St. 596, 180 N.E. 51, 54; Mendenhall v. Springfield Traction Co. (Mo.App.) 26 S. W.(2d) 50, 52; Delaware, L. & W. R. Co. v. Roalefs (C.C.A.3) 70 F. 21, 22; United States v. Nickle (C.C.A.8) 60 F.(2d) 372; United States v. Roberts (C.C.A.10) 62 F. (2d) 594; Peoria Cordage Co. v. Industrial Board of Illinois et al., 284 Ill. 90, 119 N.E. 996, L.R.A.1918E, 822.

The statements of a person, injured as the result of an accident, to his attending physician as to the causes of his injury and the circumstances under which it occurred, are not admissible as an exception to the hearsay rule, even though made for the purpose of diagnosis and treatment, unless they are made so soon after the accident and under such circumstances as to be regarded as a part of the res gestæ. Boston & Albany Railroad Co. v. O'Reilly, 158 U.S. 334, 336, 337, 15 S.Ct. 830, 39 L.Ed. 1006; Reid v. Yellow Cab Co., 131 Or. 27, 279 P. 635, 67 A.L.R. 1, 4; Maine v. Maryland Casualty Co. et al., 172 Wis. 350, 178 N.W. 749, 15 A.L.R. 1536; Cleveland Ry. Co. v.

336

Merk, supra, 124 Ohio St. 596, 180 N.E. 51, 53, 54; Weber v. St. Paul City Railway Co., 67 Minn. 155, 69 N.W. 716; Williams v. Great Northern Ry. Co., 68 Minn. 55, 70 N.W. 860, 37 L.R.A. 199; Strommen et al. v. Prudential Ins. Co., 187 Minn. 381, 245 N.W. 632, 634; Peoria Cordage Co. v. Industrial Board of Illinois et al., supra, 284 Ill. 90, 119 N.E. 996, L.R.A.1918E, 822; Brady v. Springfield Traction Co., 140 Mo.App. 421, 124 S.W. 1070, 1073; Wigmore on Evidence, § 1722.

The statements of the insured to Dr. Rendleman on September 7th as to having fallen on the golf course on September 5th were inadmissible and should have been excluded as hearsay. While the court instructed the jury that these statements were not evidence of a fall, that did not cure the evil, because such statements were not admissible for any purpose. The plaintiff's testimony as to what the insured told the doctor might have been received after the close of the defendant's case, had it been competent, Grand Trunk R. R. Co. v. Richardson et al., 91 U.S. 454, 470, 23 L.Ed. 356; but it was not competent. The incompetent testimony of Dr. Rendleman which had been improperly received, over the defendant's objection, could not be discredited by the introduction of the incompetent testimony of the plaintiff.

The defendant claims that the portions of the deposition of Kleb, which were offered in evidence by the plaintiff and received, were incompetent and prejudicial. Kleb was the general agent of the defendant at Cairo. He had authority to issue policies and to make adjustments within limits. It was upon his investigation and the information furnished by him that the defendant paid the weekly indemnity for three days' total disability under each policy, upon the theory that such' disability was due to an accident. It appeared that Kleb had no personal knowledge as to any accident, but that he had satisfied himself that the insured had sustained a fall and believed his disability prior to death to be due to the fall. This testimony clearly bore upon the weight to be given by the jury to the payment by the defendant of the weekly indemnity, which payment, being inconsistent with the defendant's claim at the trial that no accident had occurred, was some evidence to

the contrary. The fact that the defendant's officers and agent had no personal knowledge of a fall having been sustained merely affected the weight of the evidence. It must be remembered that while the insured was alive there was at least one person who was a competent and material witness as to the fall, and we know of no reason why one might not honestly believe that the action of the defendant in making payment was based on statements made by the insured to its agent which the defendant accepted as true.

We quote the following from Wigmore on Evidence, pp. 511–513, § 1053:

"A primary use and effect of an admission is to discredit a party's claim by exhibiting his inconsistent other· utterances. It is therefore immaterial whether these other utterances would have been independently receivable as the testimony of a qualified witness. It is their inconsistency with the party's present claim that gives them logical force.

"(1) In particular, personal knowledge, as indispensable to a witness * * *, is here not required. * * * The conflict of claims is the significant circumstance, and the element of personal knowledge merely increases or lessens that significance. Since a party may make a claim and file averment of pleadings without regard to personal knowledge of the facts, it is fallacious to exact, in his contrary admissions, an element of personal knowledge which is not required for the original advancement of his claim. Such a requirement is repudiated in the better judicial view: * * *

"(3) The Opinion Rule (post § 1917) does not limit the use of a party's admissions. The reason for that rule does not apply to a party's admissions."

In Kitchen v. Robbins, 29 Ga. 713, 716, a leading case on this subject, is was said: "Are no admissions good against a party, unless founded on his personal knowledge? The admissions would not be made except on evidence which satisfies the party who is making them against his own interest, that they are true, and that is evidence to the jury that they are true. Admissions do not come in, on the ground that the party making them, is speaking from his personal knowledge, but upon the ground that a party will not make admissions against himself unless they are true. The fact that he makes them against his interest, can be reasonably explained only on the

supposition that he is constrained to do so by the force of the evidence. The source from which a knowledge of the facts is derived, is a circumstance for the jury to consider, in estimating the value of the evidence, but that is all."

See, also, Reed v. McCord, 160 N.Y. 330, 54 N.E. 737, 740; Fitzgerald v. Lozier Motor Co., 187 Mich. 660, 154 N.W. 67, 69; Binewicz v. Haglin, 103 Minn. 297, 115 N.W. 271, 272, 15 L.R.A.(N.S.) 1096, 14 Ann.Cas. 225; Stone v. Stone, 191 Mass. 371, 77 N.E. 845, 846; Wasey v. Travelers' Ins. Co., 126 Mich. 119, 85 N. W. 459, 460, 461; and Sparr & Green v. Wellman, 11 Mo. 230, 234.

It is next contended that it was error to permit one of the plaintiff's medical experts to testify as follows: "As I said, the aorta appears so entirely normal from all, in all respects that the only thing which could have caused that rupture, his aorta to rupture, is trauma of some kind." The question which elicited this answer was objected to on the ground that it was argument and incompetent. It is now contended that the doctor invaded the province of the jury and expressed an opinion upon the entire case. That question was not presented below and so is not before us, but is obviously without merit. Illinois Power & Light Corporation v. Hurley (C.C.A.8) 49 F.(2d) 681, 685. What caused, or could have caused, the rupture of the aorta was a pertinent medical question.

Defendant says that it was improper to permit the plaintiff to ask her experts to assume that the insured had fallen, because there was no evidence of a fall. We have already shown that there was.

The Sufficiency of the Evidence to Support the Verdict.

As to the fall, there was, in addition to the testimony of Block, the testimony of the caddy that the knickers of the insured were clean when he left the club house and that he noticed while on the seventh fairway that he had some mud on them between the knee and hip; the payment by the defendant of the indemnity for total disability for the three days prior to death; and the testimony as to the insured's changed condition after the golf game. The question whether the insured fell during the golf game was clearly for the jury.

The medical testimony given at the trial was in direct conflict. That introduced by the plaintiff was to the effect that the aorta of the insured was normal for a man of his years, and that the fall caused, or could have caused, the rupture of the aorta and his death, independently of any disease. The medical experts testifying for the defendant gave it as their opinion that death was due primarily to a diseased condition of the aorta and that a fall such as it was claimed the insured sustained could not rupture a normal aorta of a man sixty years of age.

The defendant urges us to disregard the opinions of the plaintiff's experts on the ground that they are unreasonable and absurd, and to accept those of its experts. Whether the normal aorta of a man sixty years of age can be injured by a fall on a golf course, so as to cause his death several days later, is a medical question. The same argument as is made by the defendant was made in Mutual Life Ins. Co. of New York v. Still (C.C.A.8) 78 F.(2d) 748, where an insured with a diseased gall bladder developed a degeneration of the liver following a fall. The court said [78 F.(2d) 748, at page 750]:

"In this case, the expert testimony was directly in conflict. The court below could not say, nor can we say, that it conclusively appears from the medical evidence that the degeneration of the insured's liver was not due to the accident, but was caused, in whole or in part, by infection from the gall bladder. The existence of the disease and the causes of the disease were medical questions. United States v. Clapp (C.C.A. 2) 63 F.(2d) 793, 794; Ætna Life Ins. Co. of Hartford, Conn., v. Kelley (C.C.A. 8) 70 F.(2d) 589, 593, 93 A.L.R. 471.

"Whether the death of the insured was caused solely by the accident or wholly by the diseased gall bladder, or partly by the accident and partly by the diseased gall bladder, was, under the evidence, clearly for the jury to determine, and the jury's finding is conclusive. Atchison, T. & S. F. Ry. Co. v. Condos (C.C.A.8) 30 F.(2d) 669, 671; Illinois Power & Light Corporation v. Hurley et al. (C.C.A.8) 49 F. (2d) 681, 686; Concordia Fire Ins. Co. of Milwaukee v. Commercial Bank of Liberty, Mo. (C.C.A.8) 39 F.(2d) 826, 830; Preferred Accident Ins. Co. of New York v. Combs (C.C.A.8) 76 F.(2d) 775, 784, supra."

The Argument of Counsel for the Plaintiff to the Jury.

The statements of counsel to the jury, of which the defendant complains, are:

1. "Now, when this accident happened and he was laid up for three days, they paid him on each one of the policies, and they paid him exactly the amount that he is entitled to." This was not improper argument, as has already been demonstrated.

2. "Right after he died, what do they do? Their agent runs around to Doctor Van Andrews and to the various friends and says by no means should they have an autopsy, and he tried to put it on the ground gentlemen— " Counsel for the defendant then objected on the ground that there was no testimony that Mr. Kleb ever said he did not want an autopsy. Counsel for the plaintiff said: "Oh, yes, Doctor Van Andrews testified to that in his deposition." The court overruled the objection. Counsel for the plaintiff proceeded, saying: "You gentlemen will remember Doctor Van Andrews, their witness, whose deposition they took, testified that Kleb came to see him and said, 'By no means do we want this autopsy. Oh! he said, Doctor Woelfle would not have liked it,' he said, 'Persuade the widow not to have it'; and then it is not held, and they thought they had buried the evidence of this accident, but they had not, because there is a Divine Providence that stepped forward to see that this lady would have her day in court, and if you gentlemen say that she is not entitled to this money, then she is satisfied to do without it; if she is entitled to it, gentlemen, she ought to have it. It is hard enough for a country doctor to pay premiums to try to leave his widow where she can live, and then have an insurance company pull the stunt that this one did, it is enough to make anybody's blood boil. And the money they have spent, the little bit that has tricked out in here! I did not ask these other witnesses; I did not care; if a witness was half-way fair, I would not ask him what he got, because I don't care; but when I see a witness is unfair, prejudiced, then I know there is something behind it, gentlemen, and when Doctor Samuel Gray took the stand and showed the prejudice he showed in this case, I just had to bring out why—and one or two others."

Dr. Van Andrews, a dentist of Cairo and a friend of the insured, had testified to examining his teeth shortly after the golf game; and that he was present with other friends of the insured, including Mr. Kleb, the evening of September 9th, at the home of the insured, after his death; that the occurrence at the golf course was discussed generally, and there was a discussion about an autopsy; that he talked to Mr. Kleb and that neither of them wanted it done; that he (Dr. Van Andrews) did not think an autopsy ought to be performed and objected to it because he had heard the insured comment unfavorably on autopsies and knew that he hated to do them; and that Mr. Kleb expressed the same opinion that he (Dr. Van Andrews) did relative to an autopsy. We do not find in the record anywhere any evidence justifying the statement that Mr. Kleb ran around to Dr. Van Andrews and to various friends and said that by no means should they have an autopsy and to persuade the widow not to have one. That statement was improper and prejudicial.

The statement as to the pulling of a stunt by the insurance company that was enough to make one's "blood boil" was, to say the least, intemperate. The defendant had nothing to do with selecting Dr. Rendleman as the insured's attending physician. Dr. Rendleman certified that the insured died of angina pectoris. If he died of angina pectoris, the defendant owed nothing. While there may have been an element of unfairness in the defendant's paying for total disability prior to death, on the ground that the insured sustained a fall, and then denying, after death, that he had sustained one, there was not the slightest impropriety in denying liability for a death attributed to angina pectoris, and not to an accident. Counsel for the plaintiff seems to have assumed in his argument to the jury that the defendant knew not only that the insured had fallen, but that in falling he had injured his aorta in such a way that it ruptured on September 9th, and that the defendant thereupon undertook to conceal and suppress these facts. On the face of the record, this is absurd. The insured himself, who was an experienced physician, did not know what had happened. He first thought it might be his teeth, and consulted his dentist. He apparently had some of the symptoms

of influenza. Dr. Rendleman obviously did not know what the trouble was; he treated the insured for influenza, and attributed his death to angina. There was nothing about the denial of the claim of the widow by the defendant, under the circumstances, which should have made the blood of a normal person boil, nor do we think that the record discloses that the defendant "pulled" any "stunt." The suggestion that the defendant's experts were influenced by the amount of their fees and were prejudiced was legitimate argument.

3. In referring to Kleb, the agent of the defendant whose deposition was used by the plaintiff, counsel said: "This friend of hers (Mrs. Woelfle's), in St. Louis today, who is afraid and ashamed to come in and face this jury, who served this company, their own agent, was not produced for you to look at, although they were willing to bring a man from Chicago, all the way from Chicago, pay him a hundred dollars—two hundred dollars to come down here and be present at an autopsy. Their agent, they would not bring before you and let you look at him."

While the evidence fails to warrant the statement that Mr. Kleb was either afraid or ashamed to face the jury, we are not prepared to say that some reference to his failure to appear as a witness in the case would not have been justified. As already pointed out, he was not an immaterial witness. He was the defendant's agent and had had much to do with this controversy since its inception. All through the trial the plaintiff was endeavoring to create the inference that, had it not been for Kleb, the testimony of Block and of Dr. Rendleman would have been favorable to her. It is conceivable that the failure of Kleb to appear and testify that he had not influenced Block or Dr. Rendleman with respect to their testimony would have justified some inference that the plaintiff's contention in that regard was not unfounded. The defendant did not object to the statement nor call it to the attention of the trial judge. It seems probable that it was not regarded as of great moment at the time it was made. While we think the language used was intemperate and susceptible of misconstruction, we cannot say that, standing alone, this statement would require a new trial.

4. "From the time that he (the insured) left the seventh hole, even Block, as prejudiced and vicious as he was, and as much as he wanted to help his esteemed friend, Kleb, the agent of this company, said that he did not play the last holes as he usually played, didn't he? And that was after Kleb had returned to the city and after Block had repudiated his solemn affidavit that he had prepared himself and sworn to before a notary." Block had sworn falsely either in his original affidavit or in his deposition; hence counsel's characterization of him, and the inferences which were drawn in argument as to his reasons for giving testimony inconsistent with his first statements, were not improper argument.

5. "They (the defendant and its counsel) haven't a defense in the world, except that they have spent a lot of money for experts to try to humbug you." This was not an accurate statement of the defense asserted. The record did not justify the statement that the defendant was trying to "humbug" the jury any more than it would have justified a statement that the plaintiff was trying to "humbug" them. The question as to whether the alleged fall on the golf links caused the rupture of the aorta was a doubtful question about which there could be, and no doubt was, an honest difference of opinion. See F. W. Woolworth Co. v. Wilson (C.C.A.5) 74 F. (2d) 439, 442, 98 A.L.R. 681.

6. "Gentlemen, just imagine these doctors standing at the autopsy, why they stood there like a bunch of sharks, ready to seize on—

"Mr. Reeder (interrupting): Wait a minute. I object to that there—'the doctors stood there like a bunch of sharks.' I think that is an improper remark. I did not hear anybody testify that they had.

"Mr. London: Well, they stood there, anyway.

"Mr. Reeder: Wait a minute. Wait a minute.

"The Court: Sustain the objection.

"Mr. London: They stood there, anyway. * * *

"It doesn't make any difference whether it is an American company or whether it is English—this English company stretched out across the pond to Chicago—

"Mr. Reeder (interrupting): We object to that argument. We think it is improper argument. We object to it.

340

"The Court: Sustain the objection."

There are two objectionable features contained in the foregoing excerpts from counsel's closing argument: First, the remark that the defendant's doctors "stood there like a bunch of sharks." Second, the reference to "this English company," which could only have been made to emphasize the fact that this was an alien company and to create prejudice against it.

References to medical experts as butchers have been condemned. Ætna Life Ins. Co. of Hartford, Conn., v. Kelley (C.C.A.8) 70 F.(2d) 589, 594, 93 A.L.R. 471, and New York Life Ins. Co. v. Doerksen (C.C.A.10) 75 F.(2d) 96, 102, 103. Describing them as standing "like a bunch of sharks" is equally offensive.

Remarks tending to create an atmosphere of hostility toward foreign corporations are condemned as an appeal to sectional or local prejudice. New York Central R. R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706.

In addition to these remarks, about which the defendant complains, we note that counsel for the plaintiff in his closing argument at one point stated that "there wasn't any question about his [the insured's] having fallen, not until after he had been buried, and not until they tried to *cheat this widow*. And that is a *strong argument, but I think the evidence justifies it*."

He also kept before the jury the fact that the plaintiff was a *widow*, referred to the insured's estate as "this man's *little estate*," and closed his argument with the words: "Remember, gentlemen, this is one case for this widow; it is an ordinary case for this company. See justice between them, gentlemen; see that justice is done; and when you go to your jury room, gentlemen, remember that this same situation may occur to any one of you."

In Union Pac. R. Co. v. Field (C.C.A.8) 137 F. 14, at page 15 (cited with approval in New York Central R. R. Co. v. Johnson, supra, 279 U.S. 310, 318, 49 S. Ct. 300, 73 L.Ed. 706), Judge Walter H. Sanborn, speaking for this court, said: "Under our system of jurisprudence it is the province of the jury in actions at law to try and determine the rights of parties according to the law and the evidence. It is the duty of the court and of its officers, the counsel of the parties, to prevent the jury from the consideration of extraneous issues, of irrelevant evidence, and of erroneous views of the law, to guard it against the influence of passion and prejudice, and to assure to the litigants a fair and impartial trial. An omission by court or counsel to discharge this duty, or a persistent violation of it, is a fatal error, because it makes the trial unfair. The property of a defendant may not be lawfully transferred to a plaintiff without an impartial trial of the controversies between them. A trial is not fair and impartial in which a discussion of irrelevant issues, a statement of a persuasive but immaterial fact, or the assertion or insinuation of an erroneous view of the law or of the wrong measure of damages by counsel in his address to the jury, may have had an influence favorable to his client. The trial judge has the power, and in the first instance it is his duty, in the absence of objections by opposing attorneys, to stop and reprimand an attorney who undertakes to indulge in remarks of this nature, and, if possible, to immediately extract from the trial the vice of his obnoxious observations. And if, as is often the case, it is impossible to accomplish this, it is the duty of the court to at once discharge the jury, and to direct a new trial. This is primarily the duty of the judge because the conduct of the trial and the task of making it fair and impartial are chiefly intrusted to him, and because it is a delicate and irksome duty for a lawyer to interrupt and censure his opponent in the midst of his argument, a duty from the discharge of which the court should as far as possible relieve him. Nevertheless, this is a duty which an attorney must perform to protect the interests of his client, if the court fails to do so without his suggestion. Cudahy Packing Co. v. Skoumal, 125 F. 470, 477, 60 C.C.A. 306, 313. It is exceedingly difficult to withdraw from the minds of jurors, or from any mind, suggestions of immaterial facts, insinuations of misleading rules of action, or arguments which arouse passion or prejudice; and yet in cases in which the address of counsel conveys suggestions of this nature to the minds of the triers of the facts it is only when it is certain that these have been withdrawn that the trial is fair and impartial."

To substantially the same effect is the case of Brown v. Walter (C.C.A.2) 62 F.(2d) 798, 799, 800, in which Judge Learned Hand, speaking of the argument

of counsel for the plaintiff in that case, said: "He argued with much warmth that the whole defence had been fabricated by the insurer—transparently veiled by such provocative phrases as an 'unseen hand,' and an 'unseen force,' and the like. This had not the slightest support in the evidence; it was unfair to the last degree. Nobody can read the summation without being satisfied that the real issues were being suppressed, and the picture substituted of an alien and malevolent corporation, lurking in the background and contriving a perjurious defence. A judge, at least in a federal court, is more than a moderator; he is affirmatively charged with securing a fair trial, and he must intervene sua sponte to that end, when necessary. It is not always enough that the other side does not protest; often the protest will only serve to emphasize the evil. Justice does not depend upon legal dialectics so much as upon the atmosphere of the court room, and that in the end depends primarily upon the judge."

In New York Central R. R. Co. v. Johnson (C.C.A.8) 27 F.(2d) 699, at page 702, in referring to the arguments which were there complained of, this court, in affirming the judgment, said: "We therefore deem it proper to observe that this line of argument was likely to create prejudice, and did not aid the court or jury in the performance of their duties." Counsel for defendant in that case, in cross-examining some of the plaintiff's witnesses, had sought to bring out that the injuries which the plaintiff had were due to syphilis. The defendant introduced no evidence to show that the plaintiff had this disease, and in the argument to the jury disclaimed any such defense. Plaintiff's counsel, in their summation, severely condemned the defendant for injecting that issue into the case. The Supreme Court took the case on certiorari, and directed a reversal, saying (279 U.S. 310, 317–319, 49 S.Ct. 300, 303, 73 L.Ed. 706):

"However ill advised, counsel for petitioner [defendant] was within his rights in following this line of inquiry, and, even if it be assumed that the situation was one calling for comment on the evidence so elicited, neither petitioner nor its counsel was on trial for pursuing it. Want of good judgment 'or good taste, or even misconduct on the part of either, was not an issue in the case for the jury, nor could it excuse like conduct on the part of respondents' counsel. See Tucker v. Henniker, 41 N.H. 317, 322; Mittleman v. Bartikowsky, 283 Pa. 485, 488, 129 A. 566; Mitchum v. Georgia, 11 Ga. 615, 629; Welch v. Union Central Life Ins. Co., 117 Iowa, 394, 404, 90 N.W. 828. An exhibition of any or all of these faults was not ground for a verdict in respondents' favor or for enhancing it.

"Such a bitter and passionate attack on petitioner's conduct of the case, under circumstances tending to stir the resentment and arouse the prejudice of the jury, should have been promptly suppressed. See Masterson v. Chicago & N. W. Ry. Co., 102 Wis. 571, 574, 78 N.W. 757; Gulf, Colorado & S. F. Ry. Co. v. Butcher, 83 Tex. 309, 316, 18 S.W. 583; Tucker v. Henniker, supra, 41 N.H. 317, at page 322; Monroe v. Chicago & Alton R. R. Co., 297 Mo. 633, 644, 249 S.W. 644, 257 S.W. 469. The failure of the trial judge to sustain petitioner's objection or otherwise to make certain that the jury would disregard the appeal, could only have left them with the impression that they might properly be influenced by it in rendering their verdict, and thus its prejudicial effect was enhanced. See Hall v. United States, 150 U.S. 76, 81, 14 S.Ct. 22, 37 L.Ed. 1003; Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021; Wilson v. United States, 149 U.S. 60, 68, 13 S.Ct. 765, 37 L.Ed. 650. That the quoted remarks of respondents' counsel so plainly tended to excite prejudice as to be ground for reversal, is, we think, not open to argument. The judgments must be reversed, with instructions to grant a new trial.

"Respondents urge that the objections were not sufficiently specific to justify a reversal. But a trial in court is never, as respondents in their brief argue this one was, 'purely a private controversy * * * of no importance to the public.' The state, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence. The public interest requires that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice. See Union Pac. Ry. Co. v. Field (C.C.A.) 137 F. 14, 15; Brown v. Swineford, 44 Wis. 282, 293, 28 Am. Rep. 582. Where such paramount con-

siderations are involved, the failure of counsel to particularize an exception will not preclude this court from correcting the error."

See, also, Rouse et al. v. Burnham (C. C.A.10) 51 F.(2d) 709, 713; Nations v. United States (C.C.A.8) 32 F.(2d) 598, 600; F. W. Woolworth Co. v. Wilson (C. C.A.5) 74 F.(2d) 439, 442, 98 A.L.R. 681; Ætna Life Ins. Co. of Hartford, Conn., v. Kelley (C.C.A.8) supra, 70 F.(2d) 589, 594, 93 A.L.R. 471; Maryland Casualty Co. v. Reid (C.C.A.5) 76 F.(2d) 30.

■ In the trial of cases to a jury in the federal courts, the arguments of counsel must be confined to the issues of the case, the applicable law, the pertinent evidence, and such legitimate inferences as may properly be drawn therefrom. Union Electric Light & Power Co. v. Snyder Estate Co. (C.C.A.8) 65 F.(2d) 297, 302.

The question then arises whether the defendant is in a position to urge, as a ground for reversal, misconduct on the part of plaintiff's attorney in his argument to the jury.

The practice which is to be followed by an attorney in attempting to protect the rights of his client from the effects of improper arguments to a jury, and to preserve the questions arising therefrom for review, has not been well understood or closely followed. This is no doubt due, in part at least, to the impracticability of requiring strict adherence to a rule laid down in early times requiring that objections be made during the argument, and that when the objections are overruled and the court "refuses to condemn the action of opposing counsel, or to arrest his line of argument, or to grant other suitable relief," exceptions must be taken. Cudahy Packing Co. v. Skoumal (C.C.A.8) 125 F. 470, 476, 477; Crumpton v. United States, 138 U.S. 361, 364, 11 S.Ct. 355, 34 L.Ed. 958.

In Union Electric Light & Power Co. v. Snyder Estate Co. (C.C.A.8) supra, 65 F.(2d) 297, 302, the rule was stated thus: "Opposing counsel should except to any remarks of counsel which are claimed to be improper, so that the trial judge, in an orderly way, may have an opportunity of correcting the error, if there be one, and thus prevent the necessity of granting a new trial. The trial judge should be vigilant to protect suitors in their right to a verdict uninfluenced by improper remarks and appeals to passion and prej-

udice." It will be noted that in the case last cited, it is not said that the remarks must be excepted to at the very time that they are made.

In Nations v. United States (C.C.A.8) supra, 32 F.(2d) 598, it was held that the prejudicial and improper remarks there complained of were not cured by the mere sustaining of objections by the court; and to the same effect is New York Life Ins. Co. v. Doerksen (C.C.A.10) supra, 75 F. (2d) 96, 102.

■ The failure to except to objectionable remarks in argument does not preclude an appellate court from correcting such errors. Chicago & N. W. R. Co. v. Kelly (C.C.A.8) 74 F.(2d) 31; Ætna Life Ins. Co. of Hartford, Conn., v. Kelley (C. C.A.8) supra, 70 F.(2d) 589, 594, 93 A.L. R. 471; New York Central R. R. Co. v. Johnson, supra, 279 U.S. 310, 318, 49 S. Ct. 300, 73 L.Ed. 706.

■ In Maryland Casualty Co. v. Reid (C.C.A.5) supra, 76 F.(2d) 30, the court reaches the conclusion that an appellant may not ordinarily complain of improper argument, where his counsel has failed to adequately object or except to adverse action of the court on his objection, but that a new trial may be granted by the appellate court even where there was no objection or exception if the error can be said to be so great that justice requires that it should be corrected. This would seem to mean that where the departure from legitimate argument is not unusual or extraordinary, objections must be seasonably made, affirmative action by the court to cure the error requested, and exceptions taken to adverse rulings, before the party prejudiced may have a review. But if the departure is so unusual or extraordinary as to invoke action by the court in the public interest, the appellant may have a reversal, regardless of objections or exceptions. Counsel, who is confronted with determining whether the record which was made upon the trial entitles his client to a review by the appellate court of errors based upon misconduct of opposing counsel in final argument where there are no adequate objections and exceptions, will have difficulty in deciding that question, and in every such case the appellate court will be called upon to determine whether the misconduct was such as to be reviewable.

It is clear that, if possible, there should be some practical rule with respect to sav-

ing exceptions to improper remarks of counsel made in argument to a jury, compliance with which may reasonably be required in all cases. The appellate courts are not bound to recognize as exclusive the rule that counsel may only object and except at the time the improper argument is in progress, and are free to adopt any rule which is fair to litigants, fair to their counsel, and fair to the trial judge. Counsel for an appellant who has been injured by improper argument to the jury should not ordinarily be permitted to take advantage of errors which he has invited or provoked, or where he has remained entirely passive until after verdict, unless the objectionable remarks are so grossly improper and prejudicial as to call for action by the appellate court in the public interest. At the same time, the party who has been injured by an improper argument ought not to be precluded from securing a review, where his counsel has failed to interrupt the argument of opposing counsel, believing it would injure his client's case to do so. The rule that objections must be made during the argument arose before the days when trials were ordinarily reported in shorthand. The arguments of counsel were not and could not be readily reduced to writing. In order to make offensive remarks in argument to the jury a matter of record, it was necessary that the judge should make them a part of the minutes of the trial. Hence it was imperative that attention should be directed to such remarks as soon as they were made, if they were to be challenged at all. There is now a court reporter in attendance at the trial of nearly every case. He does not, except upon request or order of court, ordinarily take notes of the closing arguments, but he can do so. Exceptions to the charge of the court are taken at the conclusion of the charge, and no one would think of requiring or permitting counsel on either side to interrupt the trial judge while he is charging the jury. If arguments of counsel are taken by the court reporter, as they should be if any question as to the propriety of any of them is to be raised, there is, no reason why remarks claimed to be improper should not be excepted to at the conclusion of the argument and out of the hearing of the jury. To interrupt the argument of opposing counsel is often a hazardous thing to do. It may create more prejudice than it removes. It leads to controversies between counsel which interfere with the orderly conduct of the trial. Jurors do not ordinarily know the difference between proper and improper argument. They easily obtain the impression that objecting counsel is unfair and is trying to keep them from hearing something of consequence. While the judge is in a better position to deal with improper argument, his task is also one of great delicacy. He should do all that reasonably may be done to keep counsel within bounds, but his interference with argument may have the very opposite effect from that intended. These things are best known to those members of the profession who do not hesitate to appeal to passion and prejudice in the trial of their cases. The truth is that when a lawyer departs from the path of legitimate argument, he does so at his own peril and that of his client, and if his argument is both improper and prejudicial, then he has destroyed any favorable verdict that his client may obtain, unless, in some way, his error has been cured prior to the submission of the case to the jury.

There is a suggestion in some of the cases that the unoffending counsel should move for a mistrial, and that his client ought not to be permitted to speculate upon the possibility of a verdict in his favor. But the injured party has been put to the trouble and expense of a trial, has done no wrong, and, except for the misconduct of opposing counsel, would not be put to an election. Neither the court nor counsel can gauge the effect of the improper argument upon the minds of the jury. It may, and frequently does, lead to a verdict against the party whose counsel made the improper argument, and thus the trouble and expense of a new trial is saved.

If arguments of counsel are taken down by the court reporter, and if exceptions are noted at the close of an improper argument, just as exceptions are noted to the charge of the court, the trial judge will be able to determine whether the remarks excepted to are improper, whether a mistrial should be declared, whether the remarks can be cured by the charge to the jury, or whether the case should be submitted and the question of the effect of the improper argument be later determined upon a motion for a new trial in case the verdict shall go against the party excepting to the argument. This practice will also give to counsel whose argument is objectionable a chance to "eat his words" if he desires to do so and the court permits.

█ The exceptions to the argument, if made at its close, should call attention to the substance of each remark of which the party excepting complains, so that the court will be given full opportunity to take appropriate action to cure the misconduct. and thus avoid a new trial, and so that the appellate court, if an appeal is taken, may know exactly what the appellant complained of upon the trial.

█ When such an appeal is taken, the bill of exceptions should contain all of the closing arguments. This is necessary because we have already held that where improper argument was or may have been invited or provoked by the argument of opposing counsel, we would not reverse. Chicago & N. W. R. Co. v. Kelly (C. C.A.8) supra, 74 F.(2d) 31; Union Electric Light & Power Co. v. Snyder Estate Co. (C.C.A.8) supra, 65 F.(2d) 297, 301, 302.

While, as the Supreme Court has pointed out in the case of New York Central R. R. Co. v. Johnson, supra, 279. U.S. 310, 317, 49 S.Ct. 300, 73 L.Ed. 706, misconduct on the part of one counsel does not excuse like conduct on the part of his adversary, we think it is not ordinarily possible, on appeal, to determine the true extent of the alleged misconduct or its probable effect unless this court has before it all that was said to the jury by counsel on both sides.

In the future, to secure from this court, as a matter of right, a reversal of a judgment because of improper remarks of counsel in an argument made to a jury, the bill of exceptions must contain all arguments in full and must show, either that adequate objections and exceptions to rulings thereon were taken during the argument complained of, or that such remarks were specifically excepted to at the close of the argument. While failure of a party to take proper exceptions will not deprive this court of its power to grant a. new trial in the public interest, we think there is no reason why that power should be exercised in such a case except under the most unusual circumstances.

The practice of taking exceptions after the argument is not an innovation. In 1932, the state district judges in Minnesota adopted the following rule of court (186 Minn. xxxiii; rule 27): "Exceptions to remarks by counsel either in the opening statement to the jury or in the closing argument shall be taken while such statement or argument is in progress unless the same is being taken down in full by the court reporter, in which case exceptions taken at the close of the statement or argument shall be deemed seasonable." This rule was referred to and followed by the Supreme Court of Minnesota in Jovaag v. O'Donnell, 189 Minn. 315, 249 N.W. 676. It is an outgrowth of long judicial experience in the trial of lawsuits and is fair to all concerned in the trial, as well as to the appellate court in the event of an appeal.

In the case before us, the record contains all of the closing arguments. Plaintiff's counsel opened the argument to the jury, and some of the remarks objected to and which we find to be objectionable were made before the defendant replied. The personal attack of defendant's counsel, in his argument, upon plaintiff's counsel and the reference to one of the plaintiff's experts as the sort of person who tortured pet dogs to win a lawsuit, was indefensible; but there was, in our opinion, a disparity of dereliction, and the misconduct of plaintiff's counsel cannot be said to have been completely neutralized by that of opposing counsel. We realize that this was a bitterly contested lawsuit, that no quarter was asked or given, and that where there was so much feeling engendered, it was not easy for counsel to confine themselves strictly to the merits. We have endeavored to avoid being unduly critical, but have been unable to escape the conclusion that counsel for the plaintiff in his argument to the jury overstepped the bounds of legitimate advocacy, indulged in improper inferences, and appealed to the passions and prejudices of the jury. We cannot say that no prejudice resulted or that the remarks did not have the effect that it was intended that they should have, since they went wholly unrebuked by the judge.

Because of the error of the trial court in the admission of evidence, and because of the improper remarks of counsel for plaintiff in his argument to the jury, the judgment is reversed and the case remanded for a new trial.