# OCTOBER, 1937.

HORTENSE WOELFLE (PLAINTIFF), RESPONDENT, v. THE CONNECTICUT MUTUAL LIFE INSURANCE CO. OF HARTFORD, CONNECTICUT, A CORPORATION (DEFENDANT), APPELLANT.—112 S. W. (2d) 865.

St. Louis Court of Appeals. Opinion filed February 1, 1938.

*Leahy, Walther, Hecker & Ely* and *J. L. London* for respondent.

*Jones, Hocker, Gladney & Grand* and *Web A. Welker* for appellant.

BENNICK, C.—This is an action by plaintiff, the beneficiary, to recover the accidental death benefit of $2000 alleged to be due under a policy of insurance which was issued by defendant. The Connecticut Mutual Life Insurance Company of Hartford, Connecticut, upon the life of her husband, Dr. James E. Woelfle, of Cairo, Illinois, who died on September 9, 1932.

Tried to a jury, a verdict was returned in favor of plaintiff, and against defendant, for the aggregate amount of $2,253.87, which included the principal sum sued for, with interest. Judgment was rendered accordingly; and following an unavailing motion for a new trial, defendant's appeal to this court has been perfected in the usual course.

By the terms of its policy defendant agreed to pay the accidental death benefit provided for therein upon the receipt of due proof, among other things, that the death of the insured had "resulted, directly and independently of all other causes, from bodily injury effected solely through external, violent, and accidental means, of which (except in case of drowning or of internal injuries revealed by an autopsy) there shall be evidence by a visible contusion or wound on the exterior of the body."

Issue was of course joined between the parties upon the question of whether the death of the insured had occurred under such circumstances as to have made defendant liable for the payment of the accidental death benefit.

Incidentally, it is of interest to note that the insured, at the time of his death, not only had the policy in suit, but also had two policies issued by the London Guarantee & Accident Company of London, England, which, as in the case of the policy now under consideration, insured against death resulting from bodily injuries effected through accidental means, directly and independently of all other causes. An action upon those policies was brought by plaintiff in the District Court of the United States for the Eastern District of Missouri, resulting in the return of a verdict in plaintiff's favor. That case of course involved substantially the same facts as are present in the case at bar, the chief difference consising, so counsel seem to agree, in the extent to which plaintiff's medical witnesses were cross-examined. Following the verdict in plaintiff's favor, an appeal was taken by the insurance company to the Circuit Court of Appeals for the Eighth Circuit, where it was held that a case had been made for the jury, though the judgment was reversed and the cause remanded on account of what the court conceived to have been improper argument on the part of plaintiff's counsel to the jury. The Court's opinion in that case is of obvious interest in the decision of the case at bar, and is to be found reported as London Guarantee & Accident Company v. Woelfle (C. C. A.), 83 F. (2d) 325.

At the outset of this case there is a question presented of whether the Court below acquired jurisdiction over defendant's person by virtue of the service of summons upon the superintendent of the insurance department as defendant's statutory agent.

The applicable statute is Section 5894, Revised Statutes of Missouri, 1929 (Mo. Stat. Ann., sec. 5894, p. 4495), which provides, in substance, that any insurance company not incorporated by or organized under the laws of this State, desiring to transact any business by any agent or agents in this State, shall constitute the superintendent of the insurance department its statutory agent upon whom process may be served in all proceedings instituted against such company in any court of this State or in any court of the United States in this State, and that service of process had upon the superintendent of the insurance department shall be valid and binding, and shall be deemed personal service upon such company, "so long as it shall have any policies or liabilities outstanding in this State."

In this case defendant is a Connecticut Corporation but licensed to do business in this State; and, in compliance with statutory requirements, it has heretofore appointed the superintendent of the insurance department its agent for the acceptance of service of process on its behalf. The policy in suit was applied for by the insured and was

delivered to him in Illinois; he died in Illinois; and his beneficiary, the plaintiff herein, was a resident of Illinois at the time her cause of action on the policy accrued. However she thereafter removed to and established a residence in St. Louis, Missouri, and was a resident of Missouri at the time her suit was instituted and service of summons was had upon the superintendent of the insurance department.

Upon this admitted state of facts defendant has consistently taken the position that plaintiff was not entitled to the benefit of Section 5894, not having been a resident of Missouri either at the time of the issuance of the policy or at the time of the death of the insured; and that the circumstance that she had meanwhile established a residence in Missouri prior to the institution of her action on the policy did not in anywise alter the situation or serve to bring her within the statute, which was of course enacted for the benefit of citizens or residents of Missouri, but only (so defendant says) with respect to transactions had or contracts made by citizens or residents of Missouri with a foreign insurance company, regardless of whether such transactions were had or such contracts were made within or without the State.

Following the sheriff's return of service defendant moved to quash the same, and when its motion to quash was overruled it joined a plea to the jurisdiction with its answer to the merits. Thereafter, on plaintiff's motion, the plea to the jurisdiction was stricken from the answer, and the action of the court in that regard is made the first point for our consideration on this appeal.

We think that the ruling of the court was undoubtedly correct. The test of the plaintiff's right in any case to have service upon the superintendent of the insurance department is whether the policy or liability sued on is "outstanding in this State." [State ex rel. v. Landwehr, 318 Mo. 181, 191 300 S. W. 294, 298; State ex rel. v. Muller, 230 Mo. App. 962, 969, 90 S. W. (2d) 171, 174.] But to be "outstanding in this State" for the purpose of service of summons in an action brought upon it, a policy need not have been written in Missouri, nor is it in all events essential that the plaintiff should have been a resident of Missouri at the time of the death of the insured. Policies or liabilities "outstanding in this State" within the meaning of the statute necessarily include, not only policies written in Missouri, but also policies written or liabilities assumed outside of this State, but which are owned and held by residents of this State during the period of the agency of the superintendent of the insurance department and at the time suit is brought thereon. In this instance, as we have already pointed out, plaintiff was a resident of Missouri at the time her action was instituted, and the superintendent of the insurance department was the statutory agent of defendant at the time service of process was had upon him. The service was therefore valid and binding, and the very facts upon which defendant based

its plea to the jurisdiction served of themselves to show the want of any proper basis for such contention.

Not only does this conclusion conform to that which was reached by the Circuit Court of Appeals in London Guarantee & Accident Company v. Woelfle, *supra,* but as a matter of fact are advised by counsel that when the lower court overruled defendant's motion to quash the sheriff's return, defendant applied to the Supreme Court for, but was refused, a writ of prohibition designed to prohibit the lower court from undertaking to assume jurisdiction over defendant's person by virtue of such service of process. We rule, therefore, that no error was committed in the court's denial of defendant's plea to the jurisdiction.

This brings us then to a consideration of those facts in the case which have to do with the question of whether there was substantial evidence to show that the death of the insured had resulted, directly and independently of all other causes, from bodily injury effected solely through external, violent, and accidental means within the purview of the policy, which means, translated into the terms of plaintiff's actual contention, from a ruptured aorta suffered by the insured as the result of his having accidentally fallen to the ground while engaged in a game of golf upon the course of the Egyptian Golf Club located near Cairo, Illinois.

The insured was a physician and surgeon, and had been engaged in the practice of his profession in Cairo for approximately twenty-five years at the time of his death on September 9, 1932. He was then just short of sixty-one years of age; weighed from one hundred eighty-five to one hundred ninety pounds; was athletically inclined; and had a happy, jovial disposition. His complexion was ruddy, his step quick and elastic, and according to plaintiff's evidence he had always enjoyed good health; had never been wont to complain of feeling badly; and had never been confined to his home with illness of any consequence.

On September 5, 1932, which was Labor Day, the insured and one Block went out early in the afternoon for a twosome of golf on the grounds of the Egyptian Golf Club which was located eleven miles out from Cairo. Though this was only a nine-hole course, it was evidently not without its difficulties, being described by the witnesses as quite hilly, with the last three holes laid out upon the most irregular part of the course.

So far as the evidence discloses, the game had progressed without misadventure until on the approach to the seventh hole, when both Block and the insured lost their balls in the grass along the fairway. The balls had seemingly fallen from one hundred fifty to two hundred feet apart, and while Block and his caddy went to one side of the fairway to look for Block's ball, the insured and his caddy went to the other side of the fairway to search for the insured's ball.

It is at this point in the chain of events that some uncertainty arises as to precisely what occurred. After the insured's death, when plaintiff came to make claim for the accidental death benefit provided in the policies, Block gave her a sworn statement that while playing golf with the insured he "saw him fall while in the act of looking for his golf ball, on number seven fairway." Later he gave a similar statement to plaintiff and her counsel in which he stated that "when we were on No. 7 fairway I saw Doctor Woelfle picking himself from the ground after a fall. . . . When I saw him getting up from the ground he was on his side. . . . I knew he had fallen but I did not consider it serious." Subsequently Block repudiated both of such statements in so far as they purported to show that he had actually seen the insured fall, though he admitted that he did at least see the insured straighten himself up as though he were getting up from the ground.

Block's excuse for having made the statements regarding the fall was that he had been requested by plaintiff to aid her in collecting her insurance, and that even though he himself had not actually seen the insured fall, yet as an old friend of the family he had been willing to give the statements to that effect upon plaintiff's representation and assurance to him that her husband, during his last illness, had confided to her that he had fallen on the golf course.

The insured's caddy would appear to have seen nothing of the occurrence itself, and the only light he was able to throw upon the case was that whereas he had noticed that the insured's knickers were clean when he left the clubhouse, he had observed on the seventh fairway that the right leg had mud on it from the knee to the hip. Indeed, when the insured's effects were later removed from his locker, it was found that the knickers were soiled just as the caddy had observed them to be on the last day that the insured had worn them.

It is quite evident that the insured himself had no apprehensions at the time about any serious consequences resulting from his fall, since he appears to have said nothing to Block about the matter and to have made no complaint of any sort. To the contrary, he played out the last three holes of the course, though in doing so Block observed that his score for those holes was higher than usual, and then, at the completion of the game, he and Block went back to the clubhouse and had their showers and dressed, after which the insured drove his car for the distance of eleven miles back to Cairo.

The fact is, however, that the strain must even then have been bginning to tell on the insured, since upon his arrival at his home about four o'clock he lay down for a while on the davenette, a thing which it was most unusual for him to do. In recounting the incident plaintiff testified that when she came downstairs and found him lying on the davenette she observed that his face was pale and drawn.

About five o'clock the insured left home with plaintiff and certain other members of the family to drive to Carbondale, a distance of fifty-eight miles, to visit a married daughter who lived in that city. It was noticeable to the other members of the party that he moved slowly and carefully in getting into the car, and sat sluped over in the front seat alongside his son-in-law who was doing the driving. His face was pale, and contrary to his usual custom, he had nothing to say to his little grandson on the trip.

Arriving at his daughter's home in Carbondale he walked slowly up the steps and into the house, but instead of following his usual habit of picking up his grandchildren and permitting them to throw their arms around his neck, he refused to allow them to touch his neck at all. After dinner he remarked that he was not feeling well, and as a consequence lay down until nine o'clock when he and plaintiff started back alone to Cairo. On the return trip the insured did the driving, though there were times, according to plaintiff's observance of his conduct, when he would slump over the wheel and swerve off of the pavement before he would be able to straighten up and regain control of the car.

During the night, as well as on the following morning, the insured complained to plaintiff of a severe pain in his neck. He nevertheless went to his office as usual on Tuesday, but was unable to wait on his patients. When he returned home in the afternoon he again lay down on the davenette, but left word with plaintiff to call him shortly before six o'clock so that he might attend a meeting of the Rotary Club which was to be held that evening. It seems that he had been absent from a number of the meetings, and was fearful that under the rules of the club he would be suspended from membership if he did not attend the meeting which was scheduled for that night.

Leaving the Rotary Club meeting at an early hour, he stopped by his dentist's office on his way home for the purpose of having X-ray pictures taken of his teeth in the hope of determining whether the pictures might reveal a cause for the pain he was experiencing in his neck and shoulder. This fact would seem to indicate that he still had no suspicion of any condition in and around his heart to which his discomfort was to be attributed.

During the night he aroused plaintiff; complained to her that his pain was so severe that he could not endure it; and had her get his hypodermic needle out of his bag so that he might give himself an injection of morphine. During Wednesday he remained in bed, taking capsules of his own preparation for the relief of his pain.

On Thursday morning plaintiff called in Dr. J. J. Rendleman, who made an examination of the insured, diagnosed his trouble as influenza, and prescribed for him accordingly. It was thought by both Dr. Rendleman and the insured that some slight improvement

was to be noticed after a period of hours, but all to no avail, and on Friday evening the insured took a sudden turn for the worse and died from what Dr. Rendleman assumed at the time to have been angina pectoris which had developed an an added and unforeseen complication.

Some months later, after a controversy had developed between plaintiff and the insurance companies relative to the question of whether she was entitled to payment of the accidental death benefit, the body of the insured was exhumed and an autopsy performed in the presence of a number of pathologists and other medical experts representing the several parties concerned. The result of the autopsy was to show that death had resulted, not from angina pectoris as Dr. Rendleman had supposed, but from a rupture of the aorta at a point about an inch or an inch and a half above the valves at the juncture of the aorta with the heart.

The aorta, of course, is the large artery of the body, about one and a half inches in diameter, through which the blood is carried away from the heart to be ultimately distributed to the various parts of the body. It is composed of three layers, an inner coat called the intima, a middle coat called the media, and an outer coat called the adventitia. The intima is thinner than tissue paper, and has a smooth, slick surface so designed by nature as to afford a minimum of resistance to the flow of blood through the vessel. The media, which is about one-eighth of an inch in thickness, is made up of muscle tissue and elastic fibers of a character to give strength to the artery. It is in reality the important coat so far as the purpose and function of the artery is concerned. The adventitia is composed of loosely arranged muscular tissue so designed as to serve as a support for the minor blood vessels and nerves which supply the other coats, and especially the middle coat, with energy.

The autopsy revealed that a primary or initial tear about a half inch in length had occurred across the inner lining, and possibly through a portion of the middle lining, of the aorta, not extending as a tear through the entire wall of the vessel, but evidenced on the outside by only a pin point opening through which the blood had slowly escaped into the paricardial sac which enclosed the heart.

Plaintiff put on a number of eminent pathologists and medical experts, who testified, in substance, that their several examinations of specimens of the insured's aorta had revealed that it had been free from disease, or at least so at the site of the tear; that there had been no evidence of a weakening or aneurysm of the arterial wall; that the initial rupture, which had necessarily been due to a sudden stress or rise of pressure from within the organ undoubtedly superinduced by some such thing as a fall, or fright, or excitement, had been only partial; that it is scientifically possible for one to live for days, or even for weeks, with only a partial rupture of the aorta; and

that in their opinions the fall which the other evidence showed that the insured had sustained on the golf course on Monday, September 5, 1932, might have produced the condition which was found by the autopsy and which had resulted in the death of the insured four days after his fall, on September 9, 1932. Indeed their opinions were uniformly to the effect that inasmuch as all question of a diseased condition of the aorta was to be eliminated by what the autopsy had disclosed, there was nothing left but trauma which could have served to have brought about the rupture which the autopsy had revealed.

While plaintiff's witnesses admitted that they had found but little, if any, evidence of healing around the region of the tear, and this regardless of the fact that the insured had lived for four days after the occurrence of the trauma, the absence of repair was explained by the fact that the aorta, being a pulsating organ, in the very nature of things cannot be brought to that state of rest and inactively which is a requisite for quick and perfect healing.

Defendant, for its part, put on pathologists and other medical experts of equal eminence with those employed by plaintiff, who testified, in substance, that a normal aorta cannot be ruptured by mere internal pressure; that their examinations of the specimens which had been taken of the insured's aorta had shown definite signs and evidences of degeneration and disease at or near the point of the rupture; and that in their opinions the complete rupture had undoubtedly taken place at one time, with the death of the insured occurring simultaneously with the rupture.

With the facts of the case in mind, we turn now to the remaining assignments of error, which have to do with the admission of certain evidence on the part of plaintiff and the refusal of instructions, peremptory and otherwise, which were requested by defendant.

The first of such points brings into question the propriety of the court's action in having permitted plaintiff, over the objection and exception of defendant, to impeach her own witness Block, in the first instance by the introduction in evidence of his prior inconsistent written statements, and again by the testimony of plaintiff herself to the effect that Block had made prior inconsistent oral statements to her.

It will be recalled that Block had been the insured's companion on the golf course at the time it is claimed that the latter's accidental injury was received, and that in order to assist plaintiff in collecting the accidental death benefits provided by the several policies of insurance which had been carried by the insured he had given her or her attorney some three different statements in writing, purporting to show with more or less certainty that he had seen the insured fall on the seventh fairway. However when his testimony was taken he repudiated the statement that he had actually seen the insured fall,

either because such statement had not been the truth, which was his own excuse for such change in his recital of the facts, or else, as plaintiff claims, because of influence that defendant's local agent, one Kleb, had meanwhile brought to bear upon him.

The point in controversy arose in somewhat of an unusual fashion. Block did not testify in person at the trial of the case, but instead his deposition was read in evidence on the part of plaintiff, and it was at appropriate intervals in the reading of the deposition that plaintiff's counsel formally introduced the written statements regarding which Block had been cross-examined at length at the taking of his deposition. Of course, so far as concerned plaintiff's own impeaching testimony of which defendant is likewise complaining, that came in the course of her own examination in chief when she was called to the stand after the reading of the deposition had been concluded.

It appears, incidentally, that the deposition had been taken in Cairo, Illinois, where Block resided, more than three years before its use in the trial of the case in the local circuit court. At the outset of his deposition Block had testified that he and the insured had played golf together on the day in question, and then, when asked what had happened while they were playing the nine holes, had answered that "there was nothing unusual that I know, except where we lost our ball." Upon the pretext of refreshing his recollection plaintiff's counsel then asked him pointedly whether he had seen the insured fall, to which his answer was that he had not, but that he had merely seen him straightening himself up "as though he was getting up from the ground." Following his denial that he had actually seen the insured fall, plaintiff's counsel at once confronted him with his prior inconsistent written statements, and the remainder of his examination was in large part taken up with counsel's inquiry and the witness' explanation as to why he was then repudiating his original version of the facts.

In approaching the question of whether the court erred in permitting plaintiff, at the trial of the case, to impeach Block's testimony by proof of his prior contradictory statements, one thing at least is true, and that is that when plaintiff set out to read Block's deposition in evidence, she thereby made him her witness so as to place her in the position of vouching for his credibility. It is to be borne in mind that this is in no sense a case where plaintiff was obliged by law to call Block as the only possible witness by whom to prove some formal matter, but that instead she voluntarily elected to make use of his testimony which she knew was specifically directed to the material issue in the case of whether an accidental injury had been sustained. [State v. Hulbert, 299 Mo. 572, 253 S. W. 764.]

Now the rule is—and we do not understand that counsel are in any disagreement about it—that a party calling a witness will not be allowed to discredit or impeach him by showing that he has

therefore made other statements contradictory of his testimony on the stand, unless it is first made to appear that either the witness himself, or else the adverse party, has by some statement or artifice misled or entrapped the party into calling the witness, so that the adverse party has thereby gained an advantage in the case which he would not have enjoyed if he himself had called the witness. [Clancy v. St. Louis Transit Co., 192 Mo. 615, 646, 91 S. W. 509; Beier v. St. Louis Transit Co., 197 Mo. 215, 94 S. W. 876; State v. Bowen, 263 Mo. 279, 172 S. W. 367; State v. Burke, 132 Mo. 363, 34 S. W. 48; 70 C. J. 793, 1023.]

In other words, to warrant the impeachment of one's own witness, there must always exist the element of actual, and not mere feigned, surprise at the testimony which the witness gives, and even then only in the event that the testimony is of such an affirmative character as to be favorable to the adverse party, and therefore prejudicial to the party who has been misled or entrapped into calling the witness. [State v. Drummins, 274 Mo. 632, 204 S. W. 271; State v. Bowen, *supra*; State v. Gregory, 339 Mo. 133, 96 S. W. (2d) 47; 70 C. J. 1034.]

In this instance the question of plaintiff's surprise is necessarily to be considered with respect to two very different situations with which she was confronted, the first, her surprise, if any, when Block, at the time his deposition was being taken, refused to testify that he had actually seen the insured fall as he had recited in his previous extrajudicial statements regarding the incident, and the second, her surprise, if any, when her counsel set out to read the deposition in evidence.

The truth is that if we accord full significance to all the circumstances in the case as related by plaintiff and to which she attributes Block's hostility, it is extremely doubtful if she was actually surprised at his testimony even at the time his deposition was taken. It is of interest that the Circuit Court of Appeals likewise saw fit to point out in London Guarantee & Accident Company v. Woelfle, *supra*, that "it may well be doubted whether the plaintiff could properly claim that she was actually surprised by Block's testimony." Indeed, there is ample basis for the suspicion that the reason she took Block's deposition when defendant did not do so was for the purpose of making his inconsistency a matter of record, so that by discrediting his testimony, if she should ultimately be permitted to do so, there might be a situation created whereby the jury, being thus apprised of his repudiation of his previous statements, would be prompted to believe his original version of the facts.

But assuming for the sake of argument that in reliance on Block's original statements plaintiff was misled into taking his deposition and was actually surprised at his testimony that he had not seen the insured fall, and taking no account of the fact that his testimony

that he had not seen the insured fall could hardly be regarded as having amounted to affirmative testimony that the insured, as a fact, had sustained no fall, we are still of the opinion that Block's impeachment at the trial of the case was not in order. This for the simple reason that no matter how greatly surprised plaintiff may have been when Block's deposition was taken, there could naturally have been no element of surprise or imposition to be considered when three years later her counsel undertook to read the deposition in evidence at the trial of the case in the local circuit court. No one knew better than plaintiff and her counsel what the deposition contained; she was under no obligation whatever to use it as evidence; and the result is that when she elected to read it, knowing what it contained, she must be held to have done so *cum onere,* by which we mean that while she was in no sense to be precluded from proving the fact of a fall by any other witness or circumstance available to her, she was not entitled to impeach Block's testimony in his deposition, either by the introduction of his prior contradictory written statements, or by her own impeaching testimony on the stand. [Dunn v. Dunnaker, 87 Mo. 597, 601; In re Largue, 198 Mo. App. 261, 273, 200 S. W. 83.]

We gather from plaintiff's brief that she recognizes all too well the force of this conclusion, but seeks to avoid it in this case by the insistence that inasmuch as she could not compel Block's personal attendance at the trial for the reason that he resided outside the State, then of necessity the taking of his deposition was the equivalent of the hearing of his testimony at the trial. In other words, her theory is that if the element of surprise is actually and legitimately present at the taking of the deposition of a nonresident witness whose attendance at court cannot be compelled as in the case of a witness who resides within the jurisdiction of the court, then the question of surprise must necessarily arise and be determined as of the time of the taking of the deposition of the witness, which means, of course, that in her view of such a situation, the taking of the deposition is to be regarded as part and parcel of the actual trial of the case itself.

We think that this contention on the part of plaintiff is clearly untenable.

The taking of a deposition is never part of the trial of the cause in which it is taken, but is only a preparatory step designed to obtain or preserve evidence which may subsequently be used at the trial if a situation arises where such evidence is admissible and either party elects to make use of it. As is pointed out in Dunn v. Dunnaker, *supra,* the fact that a deposition has been taken and is on file in the cause creates no obligation on the part of the one who has taken it to use it as evidence, and indeed the very statute (sec. 1753, R. S. Mo. 1929; Mo. Stat. Ann., sec. 1753, p. 4023), which con-

fers the right to take depositions in a pending cause whether the witnesses reside within or without the State, likewise provides that such depositions, when taken, are only to be used "conditionally," which means that their competency is to be determined as of the time when use is sought to be made of them. [State ex rel. v. Killoren (Mo. App.), 229 S. W. 1097; State ex rel. v. Burney, 193 Mo. App. 326, 334, 186 S. W. 23.]

So far as the point now before us is concerned, plaintiff was not obliged to read Block's deposition in evidence, but when she did read it, it stood for and took the place of Block himself, and the questions of its competency and of plaintiff's right to impeach the witness were therefore to be determined as of the time when the deposition was offered in evidence. [Messimer v. McCrey, 113 Mo. 382, 390, 21 S. W. 17.] For example, had Block himself taken the stand and testified as he did in his deposition, and had plaintiff known when she put him on the stand what she unquestionably knew when she set out to read his deposition, she could obviously not have claimed surprise at the very testimony which under such circumstances she would have known that Block would give. [Baker v. Metropolitan Street Ry. Co., 181 Mo. App. 392, 168 S. W. 842.]

We repeat, therefore, that while plaintiff had the right to take Block's deposition upon her compliance with statutory requirements in the case of a witness residing without the State, the taking of the deposition was in no sense a part of the trial of the cause in which it was taken; her subsequent right to use the deposition in evidence was only conditional; and inasmuch as she was not surprised at what it contained, she was not entitled to impeach the witness by any proof of his prior contradictory statements. The only other aspect from which the question is to be considered is whether plaintiff had the right to do what we have no doubt she actually did, that is, take Block's deposition so as to have him identify and admit that he had given the prior contradictory statements, and thereby lay a foundation for the subsequent introduction of those statements in evidence as constituting affirmative, substantive proof of all the facts therein contained.

While there is some authority to be found in support of this contention—at least where the witness is actually present before the jury so that they may gather the truth from his whole conduct and bearing, even though with respect to contradictory statements he may have made at other times—the decided weight of authority, with which our own controlling decisions are in accord, is to the effect that even where it becomes proper to impeach a witness by proof of his prior contradictory extra-judicial statements, such statements are admissible only for the purpose of his impeachment, and are not to be taken as substantive and affirmative proof of the facts stated threin. [State v. Bowen, *supra*; State v. Burks, *supra*; Fesler v.

Hunter (Mo. App.), 35 S. W. (2d) 641; Steckel v. Swift & Co. (Mo. App.), 56 S. W. (2d) 806, 808; 70 C. J. 1042, 1153.]

The reason which is given for thus limiting the purpose for which prior extra-judicial statements may be employed is that if they were to be taken as proof of the facts stated therein, the testimony would be hearsay. [Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. (2d) 400.] Of course the ordinary form of hearsay is that which depends for its probative force upon the competency and credibility of some person other than the witness by whom it is sought to produce it, but it is hearsay nevertheless when advantage is sought to be taken of the witness' own prior extra-judicial statements inconsistent with his testimony on the stand, since in either event the statements, even though admittedly given, were not given under oath and subject to the test of cross-examination. [22 C. J. 206.] So it is that evidence of prior extra-judicial statements of the witness contradictory of his testimony on the stand are admissible only for the purpose of his impeachment, their character as hearsay precluding them from having probative value as independent evidence in the case. [70 C. J. 1062.]

In Pulitzer v. Chapman, *supra,* our Supreme Court did lay down the rule that so far as concerns the impeachment of a witness by his deposition in the cause, not only may he be impeached by con tradictory statements which appear therein, but his contradictory statements may also be accepted as substantive proof of the facts stated so far as they are competent and have probative value. This for the reason that testimony in a deposition is given both under oath and subject to the right of cross-examination, and is therefore not to be characterized as hearsay. However, it is to be noted that the court in its opinion specifically refused to hold that probative value should likewise be accorded to prior extra-judicial statements, and we are therefore left to follow the usual rule in such respects, which is that such statements are admissible only for the purpose of impeachment, assuming, of course, that the case is one where the impeachment of the witness is in order, a situation which we have shown did not exist in the instance under consideration.

Plaintiff speaks of defendant's duty to have sought an instruction limiting the purpose for which the statements in question were to be considered. As to this proposition, it is enough merely to say that under the facts of this case the statements were not admissible for any purpose, and consequently there was nothing to limit by way of an instruction.

We appreciate the fact that in London Guarantee & Accident Company v. Woelfle, *supra,* the Circuit Court of Appeals, in passing upon the same question, found that no error had been committed. It is to be observed, however, that in that case the matter was approached from the standpoint of plaintiff's right to have cross-

examined Block upon the appearance of his hostility. The cross-examination of one's own witness for the purpose of refreshing his recollection, or even for the purpose of laying a foundation for a proper claim of surprise, is quite a different matter than the introduction of his prior contradictory extra-judicial statements in evidence. The one is proper within reasonable limits and subject to the sound discretion of the trial court (State v. Patton, 255 Mo. 245, 164 S. W. 223; State v. Gregory, *supra*; 70 C. J. 801, 1025), but the other is permitted only when those circumstances of surprise, entrapment, and prejudice exist which serve to take the case from within the application of the general rule which prohibits the impeachment of one's own witness.

So it follows that for the error in having permitted plaintiff to impeach her witness Block by proof of his prior contradictory extra-judicial statements both written and oral, the judgment rendered cannot stand, and the only question left to be considered is that of whether there is a case to be made for the jury upon the issue of whether the death of the insured resulted, directly and independently of all other causes, from bodily injury effected solely through external, violent, and accidental means.

Disregarding Block's original statement that he had actually seen the insured fall, we are nevertheless of the opinion that his admission that he at least saw him straighten himself up "as though he was getting up from the ground," coupled with the caddy's testimony regarding his observance of mud on the insured's knickers on the seventh fairway, affords a substantial basis from which the fact of a fall at that point may be legitimately inferred. Concededly the evidence did not show the fact of a fall with the certainty that might be wished, but it was as strong and compelling as the circumstances of the particular case permit, and was perhaps no less definite than is to be found in many cases where recovery must depend on circumstantial evidence.

Nor was plaintiff's medical evidence unreasonable or unbelievable as defendant would have us hold, but instead its effect was to disclose the scientific possibility of what the actual facts and circumstances of the case tend otherwise to establish. Bearing in mind that the autopsy had revealed but a minute opening through the outer wall of the aorta through which the blood in the very nature of things could have seeped but slowly, and having due regard for the fact that the insured, a man in previous good health, had first begun to be affected shortly after his fall and had then become steadily and progressively worse until his death occurred on the following Friday, it is no great wonder that the jury chose to accept plaintiff's version of the cause of his death.

But defendant insists that a verdict in plaintiff's favor could rest only on surmise, speculation, and conjecture in view of the admis-

sions of plaintiff's own medical witnesses on cross-examination that numerous occurrences other than a fall, such, for instance, as the swinging of a golf club, could no less have sufficed to produce the ruptured aorta, if of a character to have brought any sudden strain or stress upon it, than might the fall which it is claimed that the insured received.

Now plaintiff's burden, so far as this feature of the case is concerned, is only that of establishing by substantial evidence that the rupture of the insured's aorta, resulted from an accidental fall upon the golf course. She is not required, as a part of her burden, to go so far as to exclude the possibility that the injury might conceivably have been received in some manner other than that alleged (Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 616, 20 S. W. (2d) 509, 515; State ex rel. v. Haid, 325 Mo. 107, 119, 28 S. W. (2d) 97, 102); and if it be once assumed that there is substantial evidence to be had from which it may be legitimately inferred that the insured's injury did result from an accidental fall on the golf course, then she is not to be denied the right to have her case submitted to the jury unless her own evidence discloses the actual happening of some other occurrence which might as well have caused the injury, in which event a verdict of the jury in her favor would indeed be left to rest upon mere speculation and conjecture.

The fact is, however, that regardless of defendant's insistence in the matter, there was no evidence to show any other actual occurrence to which the rupture of the insured's aorta might be attributed. Conceding that the swinging of a golf club, or any one of numerous other things, if of a character to have produced an unusual force or pressure within the aorta wall, might indeed have brought about the injury, there is this ultimate situation always to be borne in mind, that whereas there was substantial evidence adduced that the insured did fall upon the golf course and that from that very moment on his actions and conduct began to give evidence, growing steadily and progressively more pronounced, that all was not well with him, there was not one word of evidence of any other unusual or violent occurrence on that occasion, nor was there the least indication of any injury to the insured until immediately after the fall had been sustained. To the contrary, just as Block himself testified when he was interrogated by plaintiff's counsel with respect to what had happened during the afternoon: "There was nothing unusual that I know, except where we lost our ball."

So we conclude, despite defendant's earnest insistence to the contrary, that the case is one for the jury to determine upon the evidence and the legitimate inferences to be drawn therefrom.

Other matters assigned as error and not referred to herein may not appear upon a retrial of the case.

It follows that for the error noted the judgment rendered by the circuit court should be reversed and the cause remanded, and the Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the circuit court is, accordingly, reversed and the cause remanded. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.