William M. PETTIT, Appellant,

v.

UNITED BENEFIT LIFE INSURANCE
COMPANY, a Corporation,
Respondent.

No. 7309.

Springfield Court of Appeals.

Missouri.

March 26, 1955.

Richard D. Moore, Robert E. Hogan,
West Plains, for appellant.

A. W. Landis, West Plains, for respondent.

McDOWELL, Presiding Judge.

This appeal is from a judgment of the Circuit Court of Howell County, Missouri, sustaining defendant's after trial motion to set aside the verdict and judgment entered thereon October 8, 1953, in favor of plaintiff for $1,000, and entering judgment for defendant in accordance with its motion for a directed verdict offered at the close of plaintiff's case and at the close of all of the evidence.

The suit was instituted by William M. Pettit, beneficiary, named in an accident policy issued to Embert A. Pettit, by defendant, United Benefit Life Insurance Company, dated November 7, 1950, which policy among other things insured the holder thereof against loss by accidental death, in the sum of $1,000.

The answer admits the execution and delivery of the insurance policy to Embert A. Pettit as alleged in the petition and that said policy was in force at the time of the death of said Pettit on March 2, 1952, and that the policy provided that the amount to be paid to beneficiary was contingent on affirmative proof of death from accidental injuries independent of sickness and other causes, but denies that insured's death was caused by accident independent of sickness and other causes.

The answer pleaded that under the provisions of the policy it was the duty of beneficiary to furnish, within ninety days after date of loss, affirmative proof of such loss and denies that such proof was furnished but states that proof of death furnished by plaintiff showed death of insured did not result from accident but that he died as a result of disease and from natural causes and for that reason plaintiff is not entitled to recover.

The reply amounted to a general denial and especially a denial that the amount to be paid beneficiary was contingent upon proof of death for injury wholly independent of sickness, and pleads a waiver of compliance with the provisions for proof of death.

The cause was tried by jury resulting in a verdict and judgment for plaintiff in the sum of $1,000.

Motion for new trial or in the alternative to set aside verdict and judgment thereon and to enter judgment for defendant in accordance with its motion for directed verdict was filed.

The trial court sustained defendant's motion to set aside verdict and judgment thereon in accordance with its motion for directed verdict at the close of the evidence, entered judgment for defendant and overruled the motion for new trial. From this judgment plaintiff appealed.

The only issue presented on appeal is the sufficiency of the evidence to support the verdict and judgment.

The evidence is that the insured, Embert A. Pettit, died March 7, 1952; that proof of death was furnished by beneficiary to defendant and was in evidence as defendant's exhibit (A). Proof of death so furnished shows the date of death was "March 7, 1952" and cause "Falling and exposure". The physician's statement is that Embert A. Pettit's death occurred at West Plains, Missouri, and that he was of the "apparent age at death 75 years". The cause of death was set out as follows: "(a) Immediate cause of death. Coronary Thrombosis. Duration Immediate. * * * (c) Other chronic diseases or impairments. Don't Know."

The medical certificate in the death certificate stated the cause of death was "Coronary Thrombosis". It was executed by Rollin A. Smith, M. D., Coroner of Howell County.

Mrs. Alta Driscoll, a housewife living 8 miles from West Plains, testified she was acquainted with deceased and saw him almost daily; that she had known him for some three or four years and that the last month or two before his death she had seen him every Saturday. She stated she had help deceased set out strawberry plants and grape vines the summer before his death; that deceased had helped build his own house and, that from her observation, he

was in fair health, better than usual for a man of his age.

On cross-examination she stated that deceased had had a little sick spell; that he said he was sick at his stomach and she had heard him talk of his condition; that he was sick some in the summer but she did not know for how long he had been that way. She stated she saw him on Saturday before his death and he apparently was in good health.

Mrs. Ruby Johnson stated she was slightly acquainted with deceased and that shortly, prior to his death, had seen him two or three times a week; that he was able to do common labor and had helped build his home; that she never talked to deceased about his health but thought he was in good health for a man of his age. She testified that she, together with her sister and mother, went to deceased's home to see about him; that they found the body about 6 or 8 feet from his house, lying near a brush pile; that the ground around the body looked as if it had been tramped, his head was lying between a stack of lumber and a pile of brush, and there was a stick protruding from his ear; that she did not notice how deep the stick penetrated and saw no blood. She stated the deceased was lying with his face down; that his clothes were very straight on him; that his shoes and one sock, which was lying on some brush, were off; that one shoe was on a limb and the other had fallen off behind the limb but they were in reach of his hand. She stated the path along which deceased's body was found, led from the rear of the house to an outdoor toilet; that the ground was level from the porch to the place where the body was found; that there wasn't any rock on the ground where the body was but there was a pile of rocks which he had piled on the outside; that the lumber was an old stack deceased had bought to build his home and wasn't over three feet from the body; that she did not observe any bruises on deceased's head.

On cross-examination the witness stated the stick in deceased's ear was about the size of a pencil; that the porch at the back of the house was almost level with the ground and the step-off was not six inches high; that she noticed three or four letters and his glasses on the ground between the porch and deceased's body; that they were nearer the porch than his body. She stated the path along which the body was found passed between the lumber pile and the brush.

Mrs. Tom Driscoll, housewife and neighbor of deceased, testified she had known him since he lived in the community; that she saw him nearly every day when at home and during the last two months of his life, each afternoon. She testified that deceased helped build his home, set out strawberry plants and raised a little garden and had a potato patch; that he weighed about 150 pounds and was about 74 years old; that in February and March, before his death, she thought he was in fairly good health for a man of his age.

She said that deceased got milk from her home and that they had missed him coming after it and had not seen him since Monday before Friday, when they found him dead; that she was with her daughters on March 7, 1952, when they found deceased's body out toward the toilet. She stated that when they went to deceased's home his cap was on the porch and the door open and he did not answer their call; that they went to the back of the house toward the barn and her grandson found the body by the brush pile; that deceased was lying straight by the brush and had evidently struggled a great deal because the grass was worn off, he had a sock off and one on, one shoe was on the end of the brush pile and the other lying by the side. She gave this testimony:

"Q. Did you observe the condition of his clothing? A. It looked like he had covered himself up.

"Q. Did you observe or examine the deceased head? A. When we found him I naturally did look around a little and saw a little bruised place on his head.

"Q. How big? A. About like that.

"Q. About like a golf ball? A. Could have been."

She testified that there was a big rock lying close to his head; that the brush looked like it had been cut and taken from the path. She said he was lying by the brush pile and the limb was at the top of his head. She testified that this was the only mark of injuries she saw; that the weather from Monday until Friday, prior to the finding of the body, had bitter nights and warm days. She stated there was lumber on the other side of the path, maybe two or one and a half feet from deceased's head.

On cross-examination, she gave this testimony:

"Q. Mrs. Driscoll, Mr. Pettit had complained to you and Tom about having spells of some kind? A. He was sick, yes, sir.

"Q. How soon before that had he complained about having those spells? A. I imagine a week or a few days."

She stated the letters that were found on the ground were between the back porch and the body; that the body wasn't in the path.

Dennis Driscoll, a farmer and neighbor of the deceased, testified that the deceased was at his house Tuesday of the same week he died; that he had known him since he moved in the community and saw him quite a bit; that he helped work on deceased's house. He stated that the two months before his death he saw the deceased almost every day; that deceased did carpenter work which was pretty heavy. He stated deceased worked practically all day long and that his health was pretty good but that he had sick spells during that time. He stated deceased appeared to be vigorous and active. He described the place where deceased's body was found as being in the back yard on a level place. He stated there was brush, a big rock and some lumber stacked there; that one sock hung on a limb and that deceased had been doing a lot of fighting around there during his sick spell. He gave this testimony:

"Q. Can you describe the position in which *Mr. Petit* was lying? A. Laying mostly on his stomach straight out.

"Q. Will you describe the objects as you saw them near his body, where were they? A. The rock was laying about one-half foot from his head and lumber 2 or 3 feet from his head.

"Q. Did you observe the condition of the ground around where he was lying? A. It was level.

"Q. Did you observe any marks on the ground? A. Only torn up around there."

The witness testified that deceased's pocket book was under him; that his clothing was on him good; that the nights were cold and the days warm during the week before the body was found.

On cross-examination the witness testified:

"Q. You say he had complained to you of some sick spells? A. Yes, sir.

"Q. Did he tell you what kind of sickness it was? A. Just kinda like cramping.

"Q. Stomach or chest? A. In his stomach.

"Q. Had he complained of that shortly before this occurred? A. He was sick at my place Tuesday.

"Q. He was found on Friday? A. Yes, sir.

"Q. And letters back toward the porch from the house? A. A few feet out from the house.

"Q. You say his clothes, did he have on a raincoat? A. Yes, sir.

"Q. Was it wrapped around him neatly? A. It was on him good like standing up."

Mrs. Tom Driscoll was recalled for further cross-examination and gave this testimony:

"Q. You described or mentioned a bruise on his head, Mr. Pettit was a bald headed man? A. Yes, sir.

"Q. Was it a discolored place? A. You know how it might look, it was kinda reddish bluish.

"Q. It wasn't a raised place? A. No, sir.

"Q. You didn't examine it? A. No, sir, I never touched it."

And on re-direct examination the witness stated:

"A. He was laying straight as a line and had his left arm under him and this one was out like he had been throwing it around.

"Q. How were his legs? A. Straight.

"Q. Face down? A. Yes, sir, but he had turned sorta north."

The witness testified there was a big pile of rocks three or four feet behind and a big rock at the head but the rocks were not in the path.

Dr. Virgil Bailey, an osteopathic physician and surgeon, was asked the following question:

"Q. Doctor, assuming the facts you have a man 75 years old who weighs around 150 pounds whose stated health has been such that he complained of some pain in the region of his body, the left part of his abdomen, and assuming he has been doing fairly heavy work over a period of 6 months to a year and assuming this man fell the distance of his body and struck his head so there was a bruised on top of his head about the size of a golf ball, might or could such a fall have caused death or lead to some injury that caused death?"

This question was objected to as not being based upon the evidence but objection was overruled.

"A. It could."

The doctor testified that it would be advisable to have an autopsy to determine if his death was caused by heart disease; that it could not be told otherwise. He gave this answer:

"A. If there was a question of cause autopsy would tell one way or another."

On cross-examination the doctor said that a clot on the brain would be caused by a bruise on the head, such as testified to. He gave this testimony:

"Q. How much of a bruise on the head would be required to cause that? A. It depends entirely on the position of the skull.

"Q. If it were in frontal it probably would not cause a disturbance but on any other portion it might. A. Temple or basal or possibly on top.

"Q. You couldn't tell whether the bruise would be sufficient to lead to injury that caused death? A. Not until you made further examination.

"Q. You didn't examine Mr. Pettit? A. No, sir.

"Q. If you had an opportunity to examine him shortly after death you would be better qualified to state whether there was any injury that caused death? A. Certainly, if I had examined him I could determine death.

"Q. All you are testifying to now is assuming that a man had fallen and assuming that he did strike his head that there might be a possibility of that leading to some condition that might cause his death? A. Yes, sir.

"Q. That is all you can testify to? A. Yes, sir, not having seen the person."

William M. Pettit, plaintiff and beneficiary under the policy, identified defendant's exhibit (A) and admitted that the signature on the proof of loss was his and the exhibit was admitted in evidence as a part of the cross-examination of said wit-

ness for the purpose of proving admission against interest.

The policy of insurance sued on was offered in evidence.

Defendant offered no testimony and the cause was submitted on plaintiff's evidence.

In our opinion we will refer to appellant as plaintiff and respondent as defendant.

Plaintiff's first allegation of error is that the trial court erred in sustaining defendant's motion for directed judgment because there was substantial evidence to support the verdict of the jury.

■ We are bound by the findings of the jury on fact issues if supported by substantial evidence and our review is limited to determining whether the evidence considered most favorably to the result reached by the jury is substantial evidence from which the jury could reasonably reach the result it did. Machens v. Machens, Mo., 263 S.W.2d 724, 734 (16); White v. Barkovitz, Mo.App., 254 S.W.2d 291, 294 (1); Waterous v. Columbian Nat'l Life Ins. Co., 353 Mo. 1093, 186 S.W.2d 456, 457(1).

Under sub-head (2) of this alleged error, plaintiff contends it is only necessary to show that deceased died from injuries resulting from an accident, since defendant assumed the burden of proving the deceased's death was caused by disease or some other cause.

To support this contention Waterous v. Columbian Nat'l Life Ins. Co., supra, is cited. On page 460 of 186 S.W.2d of this opinion the court said: "We do not agree with the respondent that appellant had the burden to show 'that the paralysis was not caused by disease.' Since the case of Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 73 S.W. 592, 61 L.R.A. 459, 97 Am. St.Rep. 560, it has been the law in this State that the burden is on the defendant to prove that condition or death of the insured was caused by disease in those policies that had the same or similar clause that is in this policy. In that case, the

policy had the phrase, 'independent of all other causes,' which is found in the policy in the case at bar. Regardless of the view of courts in other states, the law is well established in this State and we think it is sound.

"Whether the insured's paralysis is the result of disease, is a question for the jury after the appellant made a prima facie showing of the accident resulting in the insured's condition from the bump he received on his head. Appellant's evidence showed that the insured was in good health prior to the accidental bumping of his head. The respondent had testimony that might tend to show insured's paralysis was due to disease. * * *"

■ We agree with plaintiff's contention that when plaintiff makes a prima facie case of loss by accidental injury if defendant relies upon disease as causing the loss the burden is upon him and not the plaintiff to show such defense.

This law was declared in Otto v. Metropolitan Life Ins. Co., 228 Mo.App. 742, 72 S.W.2d 811; Stewart v. Travelers Protective Ass'n, 5 Cir., 81 F.2d 25; New York Life Ins. Co. v. Roufos, 6 Cir., 83 F.2d 620; Woelfle v. Connecticut Mut. Life Ins. Co., 234 Mo.App. 135, 112 S.W. 2d 865; Broyles v. Order of United Commercial Travelers, 155 Kan. 74, 122 P.2d 763, and the other cases cited by plaintiff. In each of these cases the plaintiff made a prima facie case of accident and injury and the defendant relied upon an affirmative defense that the accident and injury was not the cause of insured's death.

■ We find under the pleadings in the instant case that the defendant's answer did not set up an affirmative defense as to the cause of death but merely alleged that under the terms of the insurance policy sued upon it was the duty of the beneficiary to provide the insurer with proof of death and the answer denied that plaintiff instead furnished a proof of death which showed the death of the insured did not result from an accident independent of sickness or other cause, but, to the con-

trary, showed the insured died as a result of heart disease. Defendant was merely pleading as a defense the proof of loss which the plaintiff, himself, had furnished.

Under the facts in the instant case it was incumbent upon plaintiff to show that the deceased suffered an accident and that the accident caused his death.

Under sub-paragraph (3) of plaintiff's first allegation of error he stated that there was substantial evidence in the record to prove the deceased died as a result of accidental bodily injury.

Under this allegation of error plaintiff makes two sub-heads, (a) "There is substantial, if circumstantial, evidence that he fell."

(b) "There is substantial evidence in the record that the deceased's fall caused his death".

Under this assignment it is the contention of plaintiff that there is substantial evidence from which the jury could find that deceased came to his death as the result of an accidental fall.

To support this contention plaintiff cites a number of authorities. Stewart v. Travelers Protective Ass'n, 5 Cir., 81 F.2d 25 is cited. The facts in this case are that deceased, just before his death, was found by the hotel maid in bed with a large mass of fresh blood and a place right behind the back of his ear from which blood was flowing. His statement to the maid that "I fell" was admitted as a part of the res gestae. There was a step-up from the room to the bath and shower, and the court held that the jury could consider the situation and location of the objects in the room, together with the insured's res gestae statement that "I fell" in determining how the wound was inflicted.

New York Life Ins. Co. v. Roufos, 6 Cir., 83 F.2d 620 was where a man, 50 years of age, was on the night of his death, at home with family and guests. After the guests departed, he announced he was going to the basement to tend the furnace for the night. A few seconds later, members of his family heard a bump or successive bumps. He was found lying upon the basement floor at the foot of the stairs and the physician who was summoned, found a bleeding cut on the back of his head. He died that night. A post-mortem, in the presence of three physicians, one a medical examiner for the insurer, disclosed a hemorrhage at the base of the brain and three fractures at the base of the skull. The medical testimony was substantially in accord that the approximate and sole cause of death was traumatic cerebral hemorrhage resulting from a fracture of the skull.

Woelfle v. Connecticut Mut. Life Ins. Co., 234 Mo.App. 135, 112 S.W.2d 865, 870. Here, it was contended that the insured was injured on a golf course. A caddy first made the statement that he saw the insured fall. Then, later, he backed up on part of his statement and said that he did not actually see him fall but had noticed his knickers were clean when he left the club house and on the seventh fairway, he noticed they had mud on them from the hips to the knee. Shortly after the game, the insured laid down and his face was pale and drawn. He complained of a severe pain in his neck. A post-mortem examination showed there was a rupture of the aorta. Pathologists testified that an examination of the aorta disclosed it was free of disease and that the nature of the rupture had been due to a sudden stress or a rise of pressure from the organ undoubtedly superinduced by such thing as a fall or a fright or excitement. The opinion stated: "Indeed, their opinions were uniformly to the effect that, inasmuch as all question of a diseased condition of the aorta was to be eliminated by what the autopsy had disclosed, there was nothing left but trauma which could have served to have brought about the rupture which the autopsy had revealed." The court held that this constituted sufficient evidence of accident to make a case for the jury.

The other authorities cited by plaintiff to establish the fact that the deceased did not have heart disease, but was in good

health, were Otto v. Metropolitan Life Ins. Co., supra; King v. Benefit Ass'n of Ry. Employees, Mo.App., 184 S.W.2d 793, 796; Colley v. Cox, Mo.App., 266 S.W.2d 778, 785; Johnson v. Missouri Ins. Co., Mo. App., 46 S.W.2d 959, 961; Scott v. Missouri Ins. Co., Mo., 233 S.W.2d 660, 664. We have examined these authorities and have commented on the facts in a part of them. The facts are so different from the facts in the case at bar as to make them inapplicable.

The record in the instant case discloses that plaintiff is the brother of the deceased and was not present at the time of his death; that as beneficiary, plaintiff made proof of death as provided in the insurance policy sued on. The proof of death shows that the deceased was 75 years of age at time of death. His birth was given as "September 23, 1876". The cause of death was stated as "Falling and exposure". However, the testimony showed that this statement was made by the beneficiary without any personal knowledge as to the cause of death. The physician's statement, attached to the proof of death, contains the following statement: "Date of death March 7, 1952. Place of death Home. (a) Immediate cause of death Coronary Thrombosis. Duration Immediate."

In Otto v. Metropolitan Life Ins. Co., supra, cited by plaintiff, 72 S.W.2d at page 814 of the opinion, this law is stated:

"It is true that, in instances where there is no explanation in the evidence of admissions in the proofs of death against interest or any contradiction thereof by substantial evidence, such admissions become conclusive, as contended by defendant. * * *" (Citing authorities.)

In Kirk v. Metropolitan Life Ins. Co., 336 Mo. 765, 81 S.W.2d 333, 339, the law is stated:

"Defendant's contention that a verdict should have been directed in its favor requires first a consideration of the admissibility and binding effect as against him of the proofs of death.

Proofs of death furnished by a beneficiary are admissible against such beneficiary to show the truth of the statements contained therein in an action brought by him on the policy, and when not contradicted or explained may preclude recovery. Burgess v. Pan-American Life Ins. Co., Mo., 230 S.W. 315; and cases cited. Such statements are prima facie only, and are not to be treated as conclusive when other facts are brought forward to explain or contradict them so as to relieve against the effect of such admission. But when not so explained, or contradicted, the statements against interest, if sufficient to defeat recovery under the law, are treated as true and given effect accordingly. * * *"

There can be no question but what the plaintiff in this action made the proof of loss containing the statement as to cause of death, to wit, coronary thrombosis, and, such statement is prima facie evidence of the truth thereof and, unless it is explained or contradicted, would bar recovery in the instant case.

We think the evidence in this case might be considered as it pertains to the question of explaining or contradicting the admission against interest in the proof of death furnished by plaintiff that the death was caused by heart disease and upon the questions of whether or not there was substantial evidence to show that there was an accident and that death resulted from such accident.

The cause was submitted to the jury upon plaintiff's evidence. We have set out that evidence in our opinion rather fully. We will here state such part thereof as we deem essential to plaintiff's recovery and which is most favorable to him. The deceased lived alone on a farm some 8 miles from West Plains in Howell County. He was a man weighing about 150 pounds and 75 years old at time of death. The witnesses, who were best acquainted with him and who had almost daily contact with him, prior to his death, testified that he did ordinary work around his little farm; that he planted strawberries, set out grape vines

and had a garden and potato patch; that he helped build the house where he lived and the witnesses gave, as their opinion, that he was in good health for a man of his age. Some of them said more than average for a man of his age. These witnesses did admit that the deceased had sick spells, cramped in his stomach and complained of being sick at his stomach during the summer before his death. Dennis Driscoll, a neighbor who worked with deceased building his home, testified that deceased was vigorous and active but had sick spells; that he saw deceased Tuesday before his death Friday and that he was sick at that time.

Deceased was found dead Friday, March 7, 1952. His body was stretched out straight along a path leading from his dwelling to an outside toilet. Both shoes were off, one was on a limb near deceased's head, the other lying on the ground as if it had fallen off the limb and in reach of deceased's body. One sock was off and hanging on a limb. His clothes were in good shape and his raincoat was wrapped neatly around his body as if he had tried to cover up. The body was about 6 or 8 feet from the house, lying between a brush pile on one side of the path, which was about 3 feet from the body, and a lumber pile on the other side of the path about 3 feet away. The ground was level from the house along the path past where the body lay. A big rock was about a half foot from deceased's head and there seemed to be a pile of rocks on the outside where deceased had picked them up and deposited them. The porch was almost level with the ground. The witnesses stated the step-up was less than six inches. There were no obstructions in the path and there were found near the house, between the house and the body, 3 or 4 letters and deceased's glasses.

Mrs. Driscoll testified that she observed a little bruised spot on deceased's bald head. She stated it was not raised but just discolored, "reddish or bluish" and that it might be about the size of a golf ball; that she did not touch it or examine it. Her daughter observed there was a small stick or twig in one of deceased's ears. She did

not know how deep it penetrated and saw no blood. The witness stated the ground around the deceased's body had been tramped and torn so as to indicate that he had struggled before his death.

Dr. Virgil Bailey, an osteopathic physician, whose qualifications were admitted, was asked a hypothetical question, which we have set out in the facts, that if the deceased fell the distance of his body and struck his head so there was a bruise on top of his head about the size of a golf ball, might or could such fall cause death or lead to some injury that caused death? He testified that it could. But the doctor admitted that whether the bruise would be fatal would depend upon the area and position on the body and he specifically stated that he could not tell whether such a bruise could cause death as propounded in the question. We quote his answer:

"Not until you made further examination".

"Q. You wouldn't say it caused death? A. Not without further examination.

"Q. You did not examine Mr. Pettit? A. No, sir.

"Q. All you are testifying to now is assuming that a man had fallen and assuming that he did strike his head that there might be a possibility of that leading to some condition that might cause his death? A. Yes, sir.

"Q. That is all you can testify to? A. Yes, sir, not having seen the person."

Under this testimony we find that the plaintiff failed to offer substantial evidence that the deceased fell; that there was circumstantial evidence that the accident, if any, caused his death. Plaintiff's evidence did show that deceased was in good health for a man of his age but it also showed the deceased was suffering from sick spells and was sick at his stomach. Such evidence does not establish that the deceased, for some cause, fell and that, as a result of the fall, received an injury upon

his head from which he died. In fact, there is no evidence in the record from which the jury could find that the discolored place on his head, testified to, was sustained at the time of the death or prior thereto or that it caused his death. Such a finding would have to be based upon guess and conjecture by piling one inference upon another. The jury would have to infer that for some reason deceased fell and that he struck something which bruised his head and that the bruise caused his death or created such a condition as to cause his death. We think there is not substantial evidence upon which to base such a finding. In fact, we find that the prima facie proof of death, as shown by the proof of death made by plaintiff to the Company, was not explained nor contradicted.

Judgment affirmed.

STONE and RUARK, JJ., concur.